PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JORGE AVILA TORREZ,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Liam O'Grady, District Judge.  (1:11-cr-00115-LO-1)

Argued:  May 9, 2017                          Decided:  August 28, 2017

Before DIAZ, FLOYD, and THACKER, Circuit Judges.

Affirmed by published opinion.  Judge Thacker wrote the opinion, in which Judge Diaz concurred.  Judge Diaz wrote a separate concurring opinion.  Judge Floyd wrote an opinion concurring in part and dissenting in part.

**ARGUED:** Julie L.B. Stelzig, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant.  James L. Trump, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF:** James Wyda, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore, Maryland; Robert E. Lee, Jr., VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER, Charlottesville, Virginia, for Appellant.  Dana J. Boente, United

States Attorney, Richard D. Cooke, Jonathan L. Fahey, Michael E. Rich, Assistant United States Attorneys, Robert J. Heberle, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

_____

THACKER, Circuit Judge:

Jorge Avila Torrez ("Appellant") was convicted of first-degree murder and sentenced to death. In this appeal, he raises a host of challenges to his conviction and death sentence. We find the challenges to his conviction to be without merit. As for sentencing, we focus on three specific challenges: (1) whether Appellant's death sentence was unconstitutional because it was based solely on post-offense conviction aggravators; (2) whether the district court erred in failing to apply the categorical approach to state convictions that made him death penalty eligible; and (3) whether the district court erred by allowing Appellant to forego a mitigation defense without conducting a second competency evaluation and hearing. For the reasons explained below, we find no reversible error in the sentencing proceedings. Accordingly, we affirm Appellant's conviction and sentence.

I.

Factual Background

We view the facts in the light most favorable to the Government, the prevailing party at trial. *See United States v. Said*, 798 F.3d 182, 186 n.2 (4th Cir. 2015).

A.

The Murder

On July 13, 2009, Amanda Snell was found dead in her room at Joint Base Myer-Henderson Hall, a residence hall on a military base located near Arlington, Virginia. When the 20-year-old Navy Intelligence Specialist did not show up for duty on Sunday night, July 12, two officers investigated and discovered her body in her room early the

next morning. She was lying in an unnatural position at an angle on the floor of a wall locker, with her knees pressed into her torso and her feet pushed against a drawer. Her head was covered by a pillowcase and pushed down into her chest.

The Naval Criminal Investigative Service ("NCIS") arrived at 7:45 a.m. on Monday, July 13, and began its investigation. Agents conducted a walk-through and inventory, took the temperature of the room and Snell's body, took photographs, and took impressions of shoeprints in the vinyl floor in front of the wall locker. The agents noticed that the bed was made, with only a fitted sheet and a comforter, and the room was clean. Based on the information gathered on the morning of July 13, the medical examiner believed Snell had been dead for 24 to 36 hours or more. After conducting an autopsy, the examiner listed the cause of death as "undetermined." J.A. 4099.[1] He noted there was "no recent or remote evidence of significant injury." *Id*. at 4101. He did note moderate dysplasia of the atrioventricular nodal artery in the heart, which "has been associated with cardiac arrhythmias and sudden death," but he did not attribute Snell's death to this condition. *Id*. at 4104. The Government later retained a second medical examiner. Based on the circumstances at the scene, this second medical examiner concluded that the cause of death was asphyxia, which can occur without any visible injury.

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

4

Appellant lived down the hall from Snell. He, like others who lived near Snell, complied with NCIS's request to complete a personal data sheet, in which he indicated that he did not know Snell and had never been in her room. He also consented to a search of his room and gave a DNA sample.

B.

The Arlington Crimes

Snell's murder remained unsolved until 2010, when Appellant was arrested for other crimes in Arlington County, Virginia. On February 10, 2010, Appellant attempted to abduct and assault M.N., a 26-year-old female who was walking to her boyfriend's house in Arlington County. Appellant approached her from behind, grabbed her jacket, showed her a gun, and told her to keep quiet and keep walking. M.N. told Appellant, "[J]ust take my bag," but he kept pushing her toward a tan Dodge Durango. J.A. 3631. He also pulled out a knife and "urge[d] [her] along to get into the car." *Id.* at 3634. M.N. dropped her bag and ran away. Once she reached a nearby friend's house, her friends called the police, but neither Appellant nor M.N.'s bag was located.

A little more than two weeks later, on February 27, 2010, two female graduate students, J.T. and K.M., were walking to K.M.'s house in Arlington County. As they stopped in front of the house, Appellant emerged from behind a parked car. He moved his sweatshirt to the side to show the women he had a gun and demanded their wallets. After the women told him they had no money, he forced them into K.M.'s house and ordered them to kneel down next to the couch. He bound their hands with a vacuum cord. At one point when Appellant left the room, the women were able to loosen their

5

hands. Appellant returned to the room with a knife and retied J.T.'s hands with an iron cord, and ordered the women to go to the bedroom. They complied, and when Appellant left the room again, J.T. managed to grab her cell phone and call 911. Appellant returned to the room, threw the cell phone against the wall, and then grabbed J.T. and led her outside to his SUV. He "showed [her] [his] gun" again and told her to get in his vehicle. J.A. 3649. After he drove for some time, he stopped, got in the back seat with J.T., and told her he was going to rape her. He forced her to perform oral sex on him, and then he put on a condom (saying, "I'm not an idiot") and raped her. *Id.* at 3652. He forced her to perform oral sex again, and then covered her face with packing tape. He drove to a secluded area and forced J.T. to perform oral sex one more time. He then took J.T.'s scarf and tightened it around her neck until she was unconscious. When she regained consciousness, she was face down in the snow with her hands above her head. Eventually, a passerby found her and called an ambulance.

Based on the description of Appellant's vehicle and the similarities and locations of the two Arlington crimes, officers arrested Appellant on February 27, 2010, at Joint Base Myer-Henderson Hall.[2] Police searched Appellant's Durango and found J.T.'s university ID and earring, packing tape, and a stun gun. In his barracks room, they found a loaded Glock 22 pistol (which was purchased on February 5) and multiple rounds of ammunition. They also seized his laptop and accessories, which contained dozens of

---

[2] Two Arlington County police officers had observed someone matching Appellant's description and driving a Dodge Durango stalking women from his car for long periods of time from February 4 through 6, days before the first Arlington crime.

sexually explicit videos and images depicting violent rapes and sexual assaults, and which were stored between April 2009 and February 2010. Many videos were "sleeping rape" videos, meaning "someone is sleeping and is attacked or raped." J.A. 3731.

Appellant was convicted in Arlington County Circuit Court for abduction with intent to defile, robbery, use of a firearm in a felony, abduction, rape, breaking and entering while armed, and forcible sodomy. On December 10, 2010, the circuit court entered judgment, imposing five life sentences, followed by consecutive sentences totaling 168 years.

## C.

### The Zion Crimes

Five years prior to the Arlington crimes, on May 8, 2005, two young girls (Laura Hobbs and Krystal Tobias) were murdered in a park in Zion, Illinois, Appellant's hometown. One witness saw the girls talking to someone who looked like Appellant, who at the time was 16 years old. When the girls did not return home that evening, a search party was deployed, and Hobbs's father and grandfather eventually found the girls the next morning in a wooded area of the park. Authorities arrived and confirmed the girls were dead; their bodies had sustained multiple stab wounds. Hobbs was stabbed 20 times, including wounds to her abdomen, side, back, and horizontal stab wounds perforating her eyelids. One of the wounds punctured her liver. Officials also discovered a significant amount of male DNA in Hobbs's right hand. Tobias was stabbed 11 times, in her stomach, intestines, liver, neck, windpipe, and cervical spine, causing significant hemorrhaging in her neck.

7

Within days, officials arrested and charged Jerry Hobbs, Laura Hobbs's father, who had a felony record. But after evidence collected during the autopsy was sent to the crime laboratory, Jerry Hobbs was excluded as a suspect based on DNA analysis. The lab also tested semen found on Hobbs's clothing, vagina, rectum, and mouth, but officials were unable to determine a source. The DNA records were put into a nationwide database, and periodically, the state DNA forensic examiner would check for a match. In June 2010, after Appellant was arrested for the Arlington crimes and his DNA entered into the system, the examiner found he was a potential match. Further testing showed that Appellant was indeed a match for the clothing and vagina DNA, as only one in every 985 quadrillion individuals would be expected to have the same profile. He also could not be excluded as the source of the other DNA found in Hobbs's right hand, anus, and mouth.[3]

D.

Osama El-Atari

While he was awaiting trial for the Arlington crimes, Appellant was held in the Arlington County Detention Facility. Because police officers suspected Appellant was planning to threaten and/or intimidate witnesses in the Arlington case, they arranged for a federal inmate, Osama El-Atari, to act as a confidential informant and record conversations between the two of them. El-Atari recorded conversations over the course

---

[3] Appellant was eventually indicted for the Zion murders in Illinois before the sentencing hearing in this case.

of approximately one week in August 2010. During those conversations, Appellant admitted to suffocating Snell in her room, calling it "[t]he perfect crime." J.A. 4307, 4325. However, his story changed over time, and sometimes he indicated he was teasing El-Atari about the details of the crime. *See, e.g.*, *id*. at 4331 (saying he strangled her); *id.* at 4319 (saying he choked her with a plastic bag); *id.* at 4335–36 (saying he choked her with a laptop cord); *id.* at 4315 (agreeing he pinned her down and "choke[d] [her] out"). He also bragged about crimes he did not commit, telling El-Atari he killed 23 people in total.

He told El-Atari that Snell was a random victim and he murdered her "for the adrenaline," J.A. 4347; because "[he] got bored," *id.* at 4377; and simply "because [he] could," *id.* at 4322. He accurately described how he placed her body in the wall locker, except he told El-Atari he put a bag over her head, rather than a pillowcase. *See id*. at 4360 ("[S]he wouldn't fit laying flat. I had to bend her fucking knees and make her like she's sitting down, 'cause it's a small closet."). He said after he killed Snell, he made the bed and thoroughly cleaned the room. Appellant said he removed one of the bed sheets, but he left the fitted sheet.[4]

---

[4] Appellant also confided to El-Atari about the murders of Laura Hobbs and Krystal Tobias. He told him he killed two girls when he was 16 years old, and when the father of one of the girls confessed, "I was like, Damn. . . . I'm clean. I'm good. I ain't got shit to worry about." J.A. 5081. Appellant recounted the murders in excruciating detail, and his story corresponded with the autopsies of the girls. But again, he changed his story about his motive. *See, e.g.*, *id.* at 5092 (stating it was "[r]andom"); *id.* at 5115 (stating he did it for "no reason"); *id.* at 5140 (suggesting the girls saw him deliver drugs). He also claimed he did not have sexual contact with either one of them.

Upon hearing this information, NCIS expedited testing of the fitted sheet, and technicians discovered a semen stain consistent with Appellant's DNA. State police had also seized Appellant's Nike shoes after his arrest for the Arlington crimes. Based on Appellant's statements to El-Atari, officials asked that those shoes be compared to the footwear impressions found in front of Snell's wall locker. A government latent print examiner testified that the shoes that made the impressions were "consistent in size, design, and wear" with Appellant's shoes. J.A. 3508.

Additionally, NCIS again interviewed Appellant. This time, he acknowledged knowing that Snell lived near him, but still said he had never been in her room.

## II.

## Procedural History

## A.

## Guilt Phase

On May 26, 2011, a federal grand jury returned an indictment charging Appellant with one count of first-degree murder of Amanda Snell. *See* 18 U.S.C. § 1111(a) (defining federal first-degree murder as the "willful, deliberate, malicious, [or] premeditated" killing of another). The indictment alleged statutory aggravating factors supporting a death sentence. Specifically, it charged that Appellant was previously convicted of a state offense "involving the use or attempted use or threatened use of a firearm," and that Appellant was previously convicted of two state offenses "involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person." J.A. 56.

10

On February 29, 2012, the Government filed a notice of its intent to seek the death penalty. *See* J.A. 75–83 (the "Notice"). The Notice listed two statutory aggravating factors: previous conviction of a felony involving the use or attempted or threatened use of a firearm; and two separate, previous convictions involving the infliction of, or attempted infliction of, serious bodily injury or death. The Notice listed the Arlington convictions in support of both aggravating factors. *See id.* at 76–78. Before trial, Appellant filed two motions to strike the statutory aggravating factors, but the district court denied both requests.

Trial commenced on March 31, 2014. The Government called more than 30 witnesses over the course of four days and introduced hundreds of pages of exhibits. Appellant's counsel cross-examined the Government's witnesses, but only presented one witness, a former Marine who lived at Myer-Henderson Hall and testified that he had been in Snell's room at one time, but lied about it because of a rule that members of the opposite sex should not be in a room together with the door closed. The jury returned a guilty verdict on the sole first-degree murder count on April 8, 2014.

B.

Penalty Phase

The district court bifurcated the penalty phase into (1) an eligibility phase, during which the jury determines whether a defendant is eligible for the death penalty based on statutory factors; and (2) a selection phase, during which the jury considers aggravating and mitigating factors and decides whether the death penalty is warranted. The eligibility phase began on April 21, 2014. As explained in more depth below, during that phase, the

11

same jury that convicted Appellant found him eligible for the death penalty based on two statutory aggravating factors. The jury then proceeded to the selection phase, where it considered both statutory and non-statutory factors and unanimously recommended a sentence of death. Appellant chose not to present mitigating evidence. On May 30, 2014, the district court adopted the jury's recommendation and sentenced Appellant to death. He noted this appeal the same day.

III.

Challenges to Murder Conviction

Appellant raises five challenges to his first-degree murder conviction: (1) whether the district court improperly limited Appellant's confrontation rights when it conditioned the cross-examination of Osama El-Atari on the admission of evidence of the Zion crimes; (2) whether the district court violated Rule 404(b) when it admitted evidence of the Arlington crimes and Appellant's electronic media showing violent pornography; (3) whether the district court committed reversible error in allowing expert testimony on shoeprint analysis; (4) whether Appellant was denied his right to an impartial jury when the district court refused to allow him to ask potential jurors whether they would consider a sentence of life upon hearing evidence that Appellant had murdered two young children and sexually abused one of them; and (5) whether the Government's use of cell site location information ("CSLI") against Appellant violated his Fourth Amendment rights.[5]

---

[5] Appellant acknowledges that his CSLI argument is foreclosed by this court's en banc decision in *United States v. Graham*, 824 F.3d 421, 423 (4th Cir. 2016) (en banc). *See* Appellant's Reply Br. 85. Thus, we will not address it here.

A.

Cross-Examination of El-Atari

Part of Appellant's defense strategy was to demonstrate that he was lying or exaggerating during the course of his jail conservations with Osama El-Atari. Thus, defense counsel sought to cross-examine El-Atari about information Appellant gave that was false or "patently incredible," including his representations to El-Atari that he committed other crimes he could not have committed. Appellant's Br. 129–30. However, the district court ruled that if Appellant proceeded with this line of questioning, the Government would be able to introduce conversations about the Zion crimes. *See* J.A. 3843 ("If you are going to get into other crimes . . . and the fact th[at] he didn't commit other crimes that he said he did, then I think it opens up Zion open wide."); *id*. at 3845 ("My ruling is that as long as you don't . . . start asking about other murders that he has committed and other crimes that aren't within the transcripts presently, I am not going to allow the Zion 404(b) evidence."). Based on this ruling, defense counsel chose not to cross-examine El-Atari about the false or exaggerated statements relating to other crimes. Appellant contends the district court's decision to condition cross-examination of El-Atari on evidence of the Zion crimes violated his Sixth Amendment rights. *See* Appellant's Br. 129–30.

We hold that the district court did not abuse its discretion. To be sure, the main reason defense counsel would have wanted to introduce Appellant's exaggerations and falsities was to show that everything he told El-Atari *could have* been false and mere boasting, including the information he gave about Snell's death. The Government was

entitled to rebut that argument with information Appellant gave to El-Atari about a crime he committed that was arguably true. Indeed, defense counsel acknowledged as much. *See* J.A. 3843 (defense counsel "agree[ing]" that asking El-Atari about the other crimes Appellant did not commit "opens up Zion . . . wide").

However, even if the district court erred in this regard, the error was harmless. *See United States v. Madden*, 38 F.3d 747, 753 (4th Cir. 1994) ("[T]he test for harmlessness is whether we can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." (internal quotation marks omitted)). To the extent Appellant contends his cross-examination would have impeached El-Atari's assertions that any lies Appellant told him were "minor" and would have allowed the jury to assess El-Atari's "asserted competence as a lie detector," Appellant's Br. 141–42, defense counsel was able to cross-examine El-Atari about the following:

- El-Atari's prior convictions for crimes involving deception;

- El-Atari's attempts to deceive Appellant about why and how long he was in prison;

- El-Atari's alleged failure to follow instructions from law enforcement;

- El-Atari's desire to get out of prison.

And on direct examination, El-Atari testified about the inconsistencies in Appellant's statements about the Snell murder, and he also testified that Appellant said he was deliberately making false statements so their discussions would be unable to be used against him.

14

Under these circumstances, it is difficult to fathom how cross examining El-Atari about *additional* falsities Appellant relayed to him would have made much difference, given that the jury already knew to approach Appellant's statements to El-Atari with caution, knowing that he deliberately (and admittedly) lied at certain points in his jailhouse conversations.  For these reasons, Appellant's argument on this point fails.

B.

Rule 404(b) Evidence

Appellant next argues that admitting evidence of the Arlington crimes and Appellant's electronic media, which contained violent pornography, violated Rule 404(b) of the Federal Rules of Evidence.  Rule 404(b) "prohibits evidence of other crimes, wrongs, or acts solely to prove a defendant's bad character, but such evidence may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *United States v. Byers*, 649 F.3d 197, 206 (4th Cir. 2011) (alterations and internal quotation marks omitted)).  This Court has articulated a four-prong test to determine the admissibility of prior-act evidence under Rule 404(b):

> (1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. . . .  (2) The act must be necessary in the sense that it is probative of an essential claim or an element of the offense.  (3) The evidence must be reliable.  And (4) the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process.

*United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997).  We review for abuse of

15

discretion. *See Byers*, 649 F.3d at 206.

The Government produced evidence of pornographic videos showing violence against women who were sleeping, unconscious, or restrained. This evidence was admitted to show intent and motive, as well as modus operandi since Snell was murdered in the early morning in her bed, and officials discovered Appellant's semen on her bed sheets. *See, e.g.*, *United States v. Blauvelt*, 638 F.3d 281, 292 (4th Cir. 2011) (upholding admission under Rule 404(b) of adult pornographic videotapes in order to prove identity, motive, and intent in child pornography case); *United States v. Brand*, 467 F.3d 179, 197 (2d Cir. 2006) (upholding admission under Rule 404(b) of evidence that a defendant possessed child pornography to show the defendant's "sexual interest in children" and thus demonstrate his intent in traveling across state lines to meet a minor (internal quotation marks omitted)); *United States v. Smith*, 103 F.3d 600, 603 (7th Cir. 1996) (explaining that a common form of evidence offered to prove who omitted a crime is "modus operandi" evidence, which is "evidence that shows a defendant's distinctive method of operation"). It was not an abuse of discretion for the district court to admit this evidence.

As for the Arlington crimes, the circumstances surrounding the offenses against M.N., J.T., and K.M. mere months after Snell's murder were relevant and necessary to demonstrate Appellant's modus operandi, motive, and intent. These offenses resembled Snell's murder in the following ways: (1) they all involved assaults on women Appellant did not know (well or at all) in their early to mid 20s; (2) they all took place in the early morning hours; (3) the motive appeared to be sexual, as evidenced by the semen on

16

Snell's bed, the rape of J.T., and Appellant's forcing of M.N. to get into his car; (4) the Snell murder (based on statements Appellant made to El-Atari) and the February 27 offense both involved tying up women with cords from electronics found in the victim's living space; (5) the Snell murder (based on statements Appellant made to El-Atari) and February 27 offense both involved strangling; (6) there was no semen found in Snell, but it was found on her bedsheet, and on February 27, Appellant used a condom when raping J.T., telling her "I'm not an idiot." J.A. 3652.

Although the crimes were certainly not identical, they "need not be"; rather they "must be similar enough to be probative of intent." *United States v. Van Metre*, 150 F.3d 339, 350 (4th Cir. 1998) (internal quotation marks omitted) (upholding admission under Rule 404(b) of evidence of a prior abduction and sexual assault by the defendant of someone other than the victim, in order to show that the defendant's "purpose in abducting [the victim] was, from the very start, for his own sexual gratification"). And the time between the crimes is within the permissible realm. *See United States v. Hadaway*, 681 F.2d 214, 217 (4th Cir. 1982) (upholding evidence of conduct committed 18 months after the crime charged and explaining, "subsequent conduct may be highly probative of prior intent. That one has thought in a particular illegal way over a period of time is evidence that one's thought patterns had already been so developed and were so operating on another previous occasion").

Nor was the evidence more prejudicial than probative. This court has held "bad acts evidence, admissible under Rule 404, is not barred by Rule 403 where such evidence did not involve conduct any more sensational or disturbing than the crimes with which

17

the defendant was charged." *Byers*, 649 F.3d at 210 (internal quotation marks omitted). As disturbing and sensational as the Arlington crimes were, a murder of a young woman in her own bedroom is even more so. Moreover, the district court gave limiting instructions and excluded evidence of J.T.'s condition after Appellant left her on the side of the road and her resulting health problems, any evidence about the Arlington crimes that was not presented in the state court trial, and any evidence about Appellant's attempt to threaten or intimidate witnesses to the Arlington crimes. *See United States v. Kibler*, 667 F.2d 452, 455 (4th Cir. 1982) (recognizing the judge's limiting instructions "[can] reduce[] the likelihood of any prejudice"). For these reasons, Appellant's Rule 404(b) argument fails.

## C.

### Shoeprint Analysis

Appellant next challenges the district court's admission of testimony from a latent print examiner. That expert testified that the shoes that made the impressions on the vinyl floor in front of Snell's wall locker were "consistent in size, design, and wear" with the Nike shoes taken from Appellant in February 2010. J.A. 3508. Even assuming the district court should have excluded the shoeprint analysis testimony, we can say with fair assurance that the judgment was not substantially swayed by the error. It is simply not probable that this evidence affected the jury's verdict, given that the jury also knew Appellant's DNA was on Snell's bed sheet, and Appellant described to El-Atari in great detail how he killed Snell and shoved her in the wall locker. Thus, we reject this claim under harmless error review. *See United States v. Hedgepeth*, 418 F.3d 411, 421 (4th Cir.

18

2005).

D.

Voir Dire

Finally, Appellant claims he was denied his Sixth Amendment right to an impartial jury when, in voir dire, the jurors were not asked this question, proposed by Appellant:

> 2. The government in this case may introduce evidence that Jorge Torrez committed a sexual assault and murder of an eight-year-old girl as well as the murder of a nine-year-old girl.
>
> . . .
>
> b. If you find Mr. Torrez guilty, then in the penalty phase of trial, would this evidence affect your ability to fairly weigh the aggravating factors against the mitigating factors and return a sentence of life without the possibility of release, or would you find it difficult to vote for life without the possibility of release?

J.A. 1799–1800 (bold type omitted).[6]  Instead, the district court said to the jurors: "I will tell you now that there may also be evidence introduced about other crimes that the Government believes that [Appellant] has committed, and those would include assault, sexual assault, and abduction, and it may include child victims." *Id*. at 1928.  The court did not, however, mention murder.

---

[6] Although this is, for all intents and purposes, a challenge to Appellant's sentence, *see* Appellant's Br. 179 n.73, we address it here because the voir dire occurred at the outset of trial, and Appellant contends the jurors were not "qualified to serve in a capital case," *see id*. at 178.

19

The district court did not abuse its discretion in rejecting Appellant's proposed voir dire question. *See Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981) ("[F]ederal judges [are] accorded ample discretion in determining how best to conduct the voir dire."). In *United States v. Caro*, we explained:

> district courts must conduct "adequate voir dire" to enable them "to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence." Because "[a]ny juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law," the Supreme Court has held that "[a] defendant on trial for his life must be permitted on voir dire to ascertain whether his prospective jurors function under such misconception."

597 F.3d 608, 614 (4th Cir. 2010) (quoting *Rosales-Lopez*, 451 U.S. at 188; *Morgan v. Illinois*, 504 U.S. 719, 735–36 (1992)).

There, we upheld the district court's choice to ask, "Are your feelings about the death penalty such that you would always vote for a sentence of death as a punishment for someone convicted of a death penalty eligible offense, regardless of the facts and circumstances?," *Caro*, 597 F.3d at 615, rather than "Do you feel that anyone convicted of *intentional and pre-meditated murder* deserves to get the death penalty? If not, what kind of case does or does not deserve the death penalty?," *id.* at 614 (emphasis supplied). We explained that the question asked by the district court "adequately enabled the district court to weed out prospective jurors irrevocably committed to imposing the death penalty." *Id.* at 615 (citing *Witherspoon v. Illinois*, 391 U.S. 510, 522 n.21 (1968) (excluding a juror who is "irrevocably committed . . . to vote against the penalty of death regardless of the facts and circumstances" does not violate the Sixth Amendment)); *see*

20

*also United States v. Tipton*, 90 F.3d 861, 878 (4th Cir. 1996) (finding satisfactory the questions of whether jurors "ha[d] strong feelings in favor of the death penalty" and if so, whether they "would always vote to impose the death penalty in every case where a defendant is found guilty of a capital offense"). Indeed, we have rejected "the suggestion that the trial court was required to ask potential jurors whether they would automatically impose the death penalty in rape-murder cases because . . . *crime-specific voir dire questions*" are not required. *Oken v. Corcoran*, 220 F.3d 259, 266 n.4 (4th Cir. 2000) (emphasis supplied) (citing *Morgan*, 504 U.S. at 728). The district court's question in this case was much more specific than the questions we found sufficient in *Oken* and *Caro*. Therefore, Appellant's argument on this point fails as well.

E.

Conclusion

For the foregoing reasons, we hold Appellant's challenges to his conviction to be without merit and therefore affirm his conviction.

IV.

Challenges to Death Sentence

In reviewing a capital sentence, we must (1) "address all substantive and procedural issues raised on the appeal of a sentence of death"; (2) "consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor"; and (3) "consider . . . whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under [18 U.S.C. §] 3592." 18 U.S.C. § 3595(c)(1). For any error in the sentencing proceeding, the

21

government must "establish[] beyond a reasonable doubt that the error was harmless." *Id.* § 3595(c)(2).

## A.

## Use of Post-Offense Conduct as Statutory Aggravator

We first consider Appellant's argument that the death penalty was unconstitutionally imposed because it was based on conduct and convictions that occurred *after* the Snell murder. We review this issue de novo. *See United States v. Runyon*, 707 F.3d 475, 502 (4th Cir. 2013).

## 1.

Under the Federal Death Penalty Act ("FDPA"), once the jury finds the defendant guilty of an offense for which a death sentence is provided, the trial proceeds to the penalty phase. In a homicide case, the jury must make certain determinations before it can impose the death penalty. Some courts, including the district court in this case, choose to bifurcate the penalty phase into an "eligibility" phase and a "selection" phase -- which, along with the guilt phase, result in an overall trifurcated proceeding.[7]

In the eligibility phase, the jury must find beyond a reasonable doubt that the

---

[7] By its plain language, the FDPA does not require a trifurcated proceeding; rather, it requires, after the guilt phase, "a separate sentencing hearing" and thus a bifurcated proceeding at minimum. 18 U.S.C. § 3593(b). Courts addressing the issue, however, have held that this language does not preclude a bifurcated sentencing hearing resulting in an overall trifurcated proceeding. *See United States v. Fell*, 531 F.3d 197, 240 (2d Cir. 2008) ("the central point of that phrase[, 'a separate sentencing hearing,'] is that the sentencing decision should be separated from the guilt phase -- not that the sentencing phase must necessarily take place during one uninterrupted hearing."); *accord United States v. Bolden*, 545 F.3d 609, 618 (8th Cir. 2008).

defendant:

> (A) intentionally killed the victim;
>
> (B) intentionally inflicted serious bodily injury that resulted in the death of the victim;
>
> (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or
>
> (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act[.]

18 U.S.C. § 3591(a)(2)(A)–(D). Also in the eligibility phase, the jury must find beyond a reasonable doubt the existence of at least one of sixteen statutory aggravating factors. *See* 18 U.S.C. § 3593(e); *id.* § 3592(c)(1)–(16).

Once the above requirements are satisfied, the defendant is eligible for the death penalty, and the proceedings continue in the selection phase, where jurors consider the presence of aggravating and mitigating factors and decide whether to recommend the death penalty. The jury must determine whether aggravating factors, both statutory and non-statutory, "sufficiently outweigh" the mitigating factors presented by the defendant to justify a death sentence, "or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify" that sentence. 18 U.S.C. § 3593(e).

In the case at hand, Appellant's murder conviction provides for a sentence of death. *See* 18 U.S.C. § 1111 (providing, "Whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life"). During the eligibility phase, the jurors found that each of the intent requirements was met with respect to Appellant's murder of Snell, and it also found that two statutory aggravating factors were satisfied, based on Appellant's Arlington crime convictions:

- The defendant "has previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm . . . against another person"; and

- The defendant "has previously been convicted of 2 or more . . . State offenses, punishable by a term of imprisonment of more than 1 year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person."

18 U.S.C. § 3592(c)(2), (4); *see* J.A. 5233–34. Finally, during the selection phase, the jury decided that the following non-statutory aggravating factors were proven:

- Appellant killed Krystal Tobias and Laura Hobbs on May 8, 2005, stabbing Krystal 11 times and Laura approximately 20 times, including in both eyes.

- Appellant sexually assaulted Laura Hobbs on May 8, 2005.

- Appellant stalked females with the intent of sexually assaulting them during the late night hours of February 4 and the early morning hours of February 5, 2010, in Arlington County, Virginia.

- On February 5, 2010, Appellant purchased a Glock semiautomatic pistol to use in abducting, robbing, and sexually assaulting female victims.

24

- On February 10, 2010, Appellant abducted M.N. at gunpoint, brandished a knife, robbed her, and tried to force her into his Dodge Durango.

- On February 27, 2010, Appellant abducted K.M. and J.T. at gunpoint and demanded money from them. He then forced them inside K.M.'s house, where he tied them up.

- On February 27, 2010, Appellant grabbed J.T. and forced her at gunpoint out of the house into his Dodge Durango. After driving for a while, he forced her to perform oral sex, bound her hands, raped her, and again forced her to perform oral sex. He then bound her mouth and head with tape and pushed her to the floor.

- On February 27, 2010, Appellant drove with J.T. on the floor of his vehicle and stopped in a wooded area. He again forced J.T. to perform oral sex on him.

- On February 27, 2010, Appellant attempted to kill J.T. by strangulation (wrapping a scarf around her neck and tightening it). J.T. lost consciousness. Appellant dumped her in the woods, but J.T. regained consciousness and was able to flag down a car. She was seriously injured.

- On February 27, 2010, Appellant was arrested. He was found in possession of a stun gun and tape in his vehicle, along with J.T.'s personal property.

- While incarcerated and awaiting trial for the Arlington crimes, Appellant plotted to have the victim witnesses against him killed.

- While incarcerated and awaiting trial for the Arlington crimes, Appellant possessed a "shank," commonly used by prisoners to kill others.

- Appellant has displayed no remorse for Snell's murder; rather, he bragged about it.

- Appellant "poses a future danger to others in that he is likely to commit, and direct others to commit, additional acts of

25

> violence in any setting, including acts of violence and threats of violence against witnesses who have testified against him."

- Appellant caused injury, harm, and loss to the victim and victim's family and friends, "as evidenced by the victim's personal characteristics and by the impact of her death upon the victim's family and friends."

J.A. 5235–38. Despite the fact that Appellant chose to present no mitigating evidence, seven of 12 jurors found one mitigating factor: that Appellant "was under the age of 18 at the time Laura Hobbs and Krystal Tobias were killed." *Id.* at 5239.

2.

Appellant contends he was not actually eligible for the death penalty, as the only statutory aggravating factors found by the jury "cannot qualify as 'previous convictions' because they occurred after commission of the [capital] offense." Appellant's Br. 15 (capitalization omitted). The district court, however, rejected Appellant's motion to strike these factors, concluding that any predicate convictions occurring *prior to sentencing* would satisfy § 3592(c)(2) and (c)(4).

a.

This court addressed and rejected this very argument in *United States v. Higgs*. *See* 353 F.3d 281 (4th Cir. 2003). Dustin Higgs was convicted of three counts of first-degree murder committed in the perpetration of kidnapping, three counts of first-degree premeditated murder, three counts of kidnapping resulting in death, and three counts of using a firearm during and in relation to a crime of violence. *See id.* at 289. All charges stemmed from events of one night, when Higgs and a companion forced three women into a car, drove them to a federal park area, and Higgs's companion shot each of them to

26

death.  *See id.* at 289–90.  The jury found three statutory aggravators supporting a death sentence on the kidnapping and murder counts (multiple killings in a single criminal episode, a prior firearm conviction, and a prior drug conviction) and an additional aggravator (death during commission of another crime) for the murder counts.  *See id.* at 300.  Higgs was ultimately sentenced to nine death sentences under the FDPA, one for each murder and kidnapping count, plus a 45-year sentence for the firearm offenses.  *See id.* at 295.

One of the myriad arguments Higgs raised was that his drug conviction, rendered after the murder but before sentencing, was not actually a "previous[]" conviction that could qualify as a statutory aggravator.  *See* 18 U.S.C. § 3592(c)(12) (listing as an aggravating factor, "The defendant *had previously been convicted* of violating title II or III of the Comprehensive Drug Abuse Prevention and Control Act of 1970 for which a sentence of 5 or more years may be imposed" (emphasis supplied)).  The district court denied Higgs's motion to strike this aggravator.  *See Higgs*, 353 F.3d at 317.

We affirmed, holding, "[T]he § 3592(c)(12) statutory aggravating factor encompasses *all* predicate convictions occurring prior to sentencing, even those occurring after the conduct giving rise to the capital charges."  *Id.* at 318 (emphasis in original).  We explained:

> Although it easily could have done so, Congress did not specify that either the prior offense or conviction had to occur before the death penalty offense.  On the contrary, the entire section speaks in terms of those things that must be considered when the death sentencing hearing is conducted and the petit jury begins its weighing process.  And, we note that where Congress has intended a different practice in other

27

circumstances, it has made that intent clear.

*Higgs*, 353 F.3d at 318 (quoting 21 U.S.C. § 841(b)(1)(C) (providing for an enhanced penalty "[i]f any person commits such a violation *after a prior conviction for a felony drug offense has become final*"); 18 U.S.C. § 922(g)(1) (stating "[i]t shall be unlawful for any person . . . *who has been convicted* . . . to [commit specified violations]") (emphases supplied)).

The district court in this case relied heavily on *Higgs* in concluding that (c)(2) and (c)(4), which use very similar language,[8] must also encompass any convictions occurring before sentencing. We agree that we are bound by *Higgs* on this point. We see no legitimate reason to distinguish (c)(12) from (c)(2) and (c)(4), all of which contain the phrase "previously been convicted." And Appellant makes no attempt to distinguish the aggravators based on the words "has" and "had," as that argument is also foreclosed by *Higgs*. *See* 353 F.3d at 319 (concluding the "grammatical difference" between *has* and *had* "is far too tenuous a basis upon which to conclude that Congress intended that the prior serious drug offense aggravating factor for homicide was to be treated differently than every other prior conviction aggravating factor"). Therefore, we are constrained to conclude that convictions occurring after the murder but before capital sentencing qualify as "previous[]" convictions under (c)(2) and (c)(4). *See Mentavlos v. Anderson*, 249 F.3d 301, 312 n.4 (4th Cir. 2001) ("[A] panel of this court cannot overrule, explicitly or

---

[8] Subsections (c)(2) and (c)(4) require that the defendant "ha*s* previously been convicted," whereas (c)(12) requires he "ha*d* previously been convicted."

28

implicitly, the precedent set by a prior panel of this court. Only the Supreme Court or this court sitting en banc can do that.").

b.

Appellant's attempts to distinguish *Higgs* are unavailing. To begin, he claims that the *Higgs* court "was not asked to decide the constitutional arguments implicated in this case, so [it] cannot be said to have decided them." Appellant's Br. 34–35. While the nuanced ex post facto, Eighth Amendment, and Fifth Amendment arguments raised here (explained in depth, *infra*) were not raised in *Higgs*, we nonetheless cannot ignore its conclusion that as a matter of statutory interpretation, the (c)(12) aggravating factor encompasses *all* predicate convictions occurring prior to sentencing.

Appellant also contends the district court failed to recognize two "critical distinctions" between *Higgs* and this case. Appellant's Br. 35. We address each in turn.

i.

First, Appellant contends that at the time of the trial in *Higgs*, the Supreme Court had not yet decided *Ring v. Arizona*, 536 U.S. 584, 609 (2002), and thus, "statutory aggravators were not viewed as elements of the offense," so post-offense conduct was "not functioning as an element of capital murder." Appellant's Br. 35. Ultimately, however, the distinction between elements and sentencing factors does not directly affect whether *Higgs*' interpretation of § 3592(c)(12) applies to this case.

As a matter of background, in *Ring*, the Supreme Court held that statutory aggravators that increase the punishment for a crime "operate as 'the functional equivalent of an element of a greater offense,' [and] the Sixth Amendment requires that

29

they be found by a jury." 536 U.S. at 609 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000)); *see also id.* at 605 ("If the legislature defines some core crime and then provides for increasing the punishment of that crime upon a finding of some aggravating fact, the core crime and the aggravating fact together constitute an aggravated crime, just as much as grand larceny is an aggravated form of petit larceny. The aggravating fact is an element of the aggravated crime." (alterations omitted) (quoting *Apprendi*, 530 U.S. at 501 (Thomas, J., concurring))).

Before *Ring*, however, the Supreme Court had concluded that the fact of a prior conviction which increases the maximum penalty for a crime is *not* an element of a separate crime; rather, it is a "penalty provision" that merely "authorizes an enhanced penalty." *Almendarez–Torres v. United States*, 523 U.S. 224, 226 (1998); *see also Jones v. United States*, 526 U.S. 227, 248 (1999) ("[T]he precise holding [in *Almendarez–Torres*] that recidivism increasing the maximum penalty need not be so charged . . . rested in substantial part on the tradition of regarding recidivism as a sentencing factor, not as an element to be set out in the indictment."). The *Apprendi* Court explained,

> Both the certainty that procedural safeguards attached to any "fact" of prior conviction, and the reality that *Almendarez-Torres* did not challenge the accuracy of that "fact" in his case, mitigated the due process and Sixth Amendment concerns otherwise implicated in allowing a judge to determine a "fact" increasing punishment beyond the maximum of the statutory range.

530 U.S. at 488 (footnote omitted). And *Ring* itself made clear that because Ring's sentence did not involve an aggravating circumstance related to a prior conviction, he did "not challenge *Almendarez–Torres*." *Ring*, 536 U.S. at 597 n.4. Thus, *Ring* explicitly

30

left unresolved the question of whether prior convictions could serve as functional elements of capital murder.

Against that backdrop, the defendant in *Higgs* asked this court to find his indictment fatally flawed in part because it did not list the prior conviction aggravating factors applicable to his death sentence. *See Higgs*, 353 F.3d at 300. We recognized, however, that "*with the exception of the fact of prior convictions*, those intent and aggravating factors which the government intends to rely upon to render a defendant death-eligible under the FDPA are the functional equivalent of elements of the capital offenses and must be charged in the indictment, submitted to the petit jury, and proved beyond a reasonable doubt." *Id.* at 298 (emphasis supplied). Thus, we held that Higgs's indictment was not defective even though the prior conviction aggravators were not alleged therein: they were simply not the "functional equivalent of elements of the capital offenses." *Id*. at 298; *see also id*. at 301–02.

We also discussed the impact of *Ring*, which had been decided during the appeal of Higgs's convictions and sentences. Although we recognized "*Ring* [may have] placed on shaky ground the *Almendarez-Torres* proposition that prior convictions that increase the maximum penalty need not be alleged in the indictment," we nonetheless concluded that "[u]ntil the Supreme Court overrules *Almendarez–Torres*, we are bound to follow its holding." *Id.* at 303; *see also United States v. Bullette*, 854 F.3d 261, 264 n.2 (4th Cir. 2017) ("Although the Supreme Court has expressed doubt about the continuing validity of *Almendarez-Torres*, it remains good law, and we may not disregard it unless and until

31

the Supreme Court holds to the contrary." (internal quotation marks omitted)).[9]

On Appellant's view, *Higgs* concluded that the prior conviction aggravators in that case functioned as "sentencing factors" *only* because other valid aggravating factors existed to make Higgs death eligible (i.e., murder during the commission of another offense). Appellant's Br. 37. In Appellant's exceedingly rare case, though, another valid aggravator *did not* exist, which Appellant says makes all the difference. Whatever the merits of Appellant's claim in the abstract, it need not detain us here, for the Government in this case *did* list the two prior conviction statutory aggravators in the indictment, and the jury found the existence of those aggravators beyond a reasonable doubt. Thus, the only issue for us is whether to apply *Higgs*' interpretation of § 3592(c)(12) to (c)(2) and (c)(4). That interpretive decision, holding that prior conviction statutory aggravators -- like § 3592(c)(12) -- include conduct occurring after the capital offense but before sentencing, depended on an analysis of legislative intent and language in other statutory

---

[9] To be sure, *Almendarez-Torres*'s holding has become "shak[ier]" in the years since *Higgs*. *See Alleyne v. United States*, 133 S. Ct. 2151, 2160 & n.1 (2013) (holding that the Sixth Amendment provides defendants with the right to a jury determination of facts increasing the statutory minimum sentence, but declining to revisit *Almendarez-Torres*, because the "parties d[id] not contest that decision's vitality"); *United States v. McDowell*, 745 F.3d 115, 124 (4th Cir. 2014) ("[T]he Supreme Court's recent characterizations of the Sixth Amendment are difficult, if not impossible, to reconcile with *Almendarez–Torres*'s lonely exception to Sixth Amendment protections." (citing *Alleyne*, 133 S. Ct. at 2160)); *see also Shepard v. United States*, 544 U.S. 13, 28 (2005) (Thomas, J., concurring) ("The parties do not request it here, but in an appropriate case, this Court should consider *Almendarez-Torres*' continuing viability. Innumerable criminal defendants have been unconstitutionally sentenced under the flawed rule of *Almendarez-Torres*, despite the fundamental imperative that the Court maintain absolute fidelity to the protections of the individual afforded by the notice, trial by jury, and beyond-a-reasonable-doubt requirements." (internal quotation marks omitted)).

schemes. While *Higgs* may have justified the effects of its interpretive decision by referencing the *Almendarez-Torres* exception, 353 F.3d at 319 n.9, its reasoning did not depend solely on treating prior conviction statutory aggravators as sentencing factors rather than elements. Thus, *Higgs*' interpretation of § 3592(c)(12) applies to the other prior conviction aggravators in § 3592(c), including (c)(2) and (c)(4), regardless of whether we treat prior conviction aggravators as sentencing factors or elements.

ii.

Second, Appellant notes that in *Higgs*, the sentencing proceeding was bifurcated, rather than trifurcated. However, there is no indication that *Higgs*'s conclusion hinged on the fact that all of the aggravators were considered together in one proceeding. Appellant's argument on this point assumes that the prior convictions were treated only as selection factors, not as statutory aggravators bearing on eligibility. This assumption is wrong. While it is true that *Higgs* stated -- in the context of Higgs's Fifth Amendment indictment challenge -- that as long as one valid statutory aggravator is alleged in the indictment, any additional factors "can be fairly viewed as sentencing considerations," it nonetheless analyzed the post-offense conduct statutory argument as if Higgs's prior drug conviction were a statutory aggravator. *Higgs*, 353 F.3d at 299, 317–19. Only *after* this analysis did this court provide an alternative reason for affirmance: there were other statutory aggravators present. Therefore, this argument does not render *Higgs* inapposite.

c.

Appellant's remaining constitutional challenges to his death sentence are foreclosed by the language and operation of the FDPA and our precedent.

33

i.

Ex Post Facto Claim

Appellant contends that "[a]llowing an element of the offense to occur post-offense and retroactively render a prior murder . . . capital murder would violate ex post facto principles." Appellant's Br. 29. Article I, section 9 of the United States Constitution provides, "No . . . ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3. The ex post facto clause "looks to the standard of punishment prescribed by a statute [and] forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer." *Lindsey v. Washington*, 301 U.S. 397, 401 (1937); *see also id.* ("It could hardly be thought that, if a punishment for murder of life imprisonment or death were changed to death alone, the latter penalty could be applied to homicide committed before the change.").

Nothing about § 3592(c)(2) or § 3592(c)(4) changed between the time of Snell's murder and the time of Appellant's sentencing. Thus, this issue turns on whether the district court's *interpretation* of § 3592(c)(2) and (c)(4) can function as a "Law" under the ex post facto clause. Appellant cites *Bouie v. City of Columbia* for the proposition that it can; however, *Bouie* reasoned that when an "unforeseeable" construction of a criminal statute is applied retroactively to subject someone to punishment for past conduct, the ex post facto clause, as well as due process concerns, are implicated. 378 U.S. 347, 353–55 (1964). It was certainly not "unforeseeable" that Appellant's murder could be elevated to capital murder based on a subsequent qualifying conviction -- that is precisely what happened in *Higgs*. *Cf. Glenn v. Johnson*, 761 F.2d 192, 195 (4th Cir.

34

1985) ("Since the interpretation of the statute was not only foreseeable but indeed was inescapable, the plaintiffs simply have no case.").

Further, Appellant's attempt to rely on *Higgs* on this point is unfounded. We decided in *Higgs* whether the "multiple killings in a single criminal episode" aggravator was properly applied, since that aggravator was not added to the FDPA until *after* the murders at issue in *Higgs*. We found an ex post facto violation occurred because the addition of that subsection of the statute "alter[ed] the elements of the offense or the quantum of punishment" and clearly "increase[d] the punishment for criminal acts" after the conduct was committed. 353 F.3d at 301. Here, in contrast, the aggravators which ultimately made Appellant death-eligible were part of the FDPA *before* the Snell murder. Thus, Appellant's ex post facto argument fails.

ii.

Eighth Amendment Claim

Appellant also claims the use of post-offense conduct to make a defendant eligible for the death penalty violates the Eighth Amendment, which provides that "cruel and unusual punishments [shall not be] inflicted." U.S. Const. amend. VIII. The Supreme Court has explained that to pass constitutional muster, the aggravating circumstance that serves to make a defendant death eligible must meet two requirements: first, it "must genuinely narrow the class of persons eligible for the death penalty"; and second, it "must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *United States v. Caro*, 597 F.3d 608, 623 (4th Cir. 2010) (quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)).

35

First, using post-offense convictions would narrow the class of defendants convicted of murder. Although Appellant argues that the previous conviction aggravators can expand the class of murderers subject to capital punishment if the offender later commits another crime, that is not the focus of the Eighth Amendment analysis. Instead, the focus is on whether the class of *offenders* is narrowed from all murderers, not the class of *offenses*. *Cf. Higgs*, 353 F.3d at 318 (suggesting prior conviction aggravators like (c)(12) "do[] not concern matters directly related to the death penalty offense [but] [r]ather [are] concerned with the characteristics of the offender as of the time that he is sentenced"). And although this interpretation expands the class of offenders with previous convictions, it nonetheless narrows the class of all murderers to only murderers with previous convictions.

Second, as to whether § 3592(c)(2) and (c)(4) reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder, *see Caro*, 597 F.3d at 623, we have explained, "one can hardly dispute the congressional wisdom that recidivism justifies harsher sentencing. Defendants with significant criminal histories demonstrate unwillingness or inability to follow the law. This justifies imposing harsher sentences to provide increased retribution and deterrence," *id*. at 623–24.

A more challenging aspect of this inquiry is whether the statute imposes the death penalty on these recidivists in a non-arbitrary and unambiguous way. Along these lines, a court "must first determine whether the statutory language defining the [aggravating] circumstance is itself too vague to provide any guidance to the sentencer." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (quoting *Arave v. Creech*, 507 U.S. 463, 471

36

(1993)); *see also Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (opinion of Stewart, Powell, and Stevens, JJ.) (The "discretion . . . afforded a sentencing body . . . must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.").

We acknowledge that permitting post-offense convictions to qualify as statutory aggravators may allow for prosecutorial manipulation of the timing of charges in order to make an earlier offense death eligible. But Appellant presents no such evidence in this case. Moreover, prosecutors have "wide discretion over whether, how, and when to bring a case," *United States v. Segal*, 495 F.3d 826, 833 (7th Cir. 2007) (internal quotation marks omitted), and Appellant's argument is not strong enough to overcome our holding in *Higgs* that (c)(12) -- and by extension (c)(2) and (c)(4) -- encompasses all offenses for which the defendant has been convicted at the time of sentencing, regardless of whether the offense or conviction occurred after the capital offense.

And as to whether (c)(2) and (c)(4) are unconstitutionally vague, *Higgs* again provides the answer. Examining the language and structure of the FDPA, we explained that "Congress did not specify that either the prior offense or conviction had to occur before the death penalty offense." *Higgs*, 353 F.3d at 318. Rather, "where Congress has intended a different practice in other circumstances, it has made that intent clear." *Id.* (citing 21 U.S.C. § 841(b)(1)(C); 18 U.S.C. § 922(g)(1)). Holding at this juncture that (c)(2) and (c)(4) are unconstitutionally vague would fly in the face of this analysis and

37

*Higgs*'s ultimate conclusion.[10]

iii.

Fifth Amendment Claim

Finally, Appellant claims his sentence violates the Fifth Amendment because it fails to provide fair notice and violates double jeopardy guarantees. The Fifth Amendment provides in relevant part, "No person shall be . . . subject for the same offence to be twice put in jeopardy of life or limb; . . . nor [shall he] be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Due Process Clause prohibits the Government from "taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Beckles v. United States*, 137 S. Ct. 886, 892 (2017).

These arguments also fail. Appellant cannot claim he had no notice of potential consequences of his actions. Section 1111 of Title 18, which provides for a penalty of death for first-degree murder, did not change between Snell's murder and Appellant's sentencing, nor did (c)(2) and (c)(4). And the district court interpreted these provisions in

---

[10] Although we recognize that we are constrained by *Higgs* on this issue, we nonetheless observe the merit of Appellant's statutory argument. Unbound by *Higgs*, one could read the phrase "has previously been convicted" in (c)(2) and (c)(4) as ambiguous and invoke the rule of lenity. And notwithstanding the lingering viability of *Almendarez-Torres*, the rule of lenity need not apply only to elements of a conviction, but can also apply to sentencing factors. *See United States v. Hall*, 972 F.2d 67, 69 (4th Cir. 1992) ("Under the rule of lenity any criminal statute, *including a sentencing provision*, must be construed in favor of the accused and against the government if it is ambiguous." (emphasis supplied)).

38

a manner consistent with the *Higgs* decision, which was issued more than five years before Snell's murder.

As for double jeopardy, there are no such concerns here. The imposition of a death sentence was not above the authorized statutory maximum punishment, and any implication that the Arlington crimes "bec[a]me[] a tail which wags the dog of the substantive offense" bears on the issue of prosecutorial misconduct, which was not raised below or in this appeal. Appellant's Br. 33 (quoting *Witte v. United States*, 515 U.S. 389, 403 (1995)).

B.

Whether the Arlington Crimes Satisfy § 3592(c)(2) and (c)(4)

We next address Appellant's argument that the Arlington crimes do not qualify as previous convictions under 18 U.S.C. § 3592(c)(2) and (c)(4). This argument has two parts: first, whether the district court should have applied the categorical approach in the eligibility phase; and second, whether the Arlington crimes satisfy the elements of (c)(2) and (c)(4). We review these issues de novo. *See United States v. Ritchie*, 858 F.3d 201, 209 (4th Cir. 2017). Because only one statutory aggravator is necessary to render Appellant death eligible, we will focus on (c)(2), which again provides: "the defendant has previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm (as defined in [18 U.S.C. § 921]) against another person."

39

1.

Categorical Approach

Appellant argues that Congress contemplated application of the categorical approach to § 3592(c)(2) and (c)(4) when it enacted the FDPA. Appellant's argument, however, contravenes the language and purpose of the FDPA, and, once again, is in tension with *Higgs*.

a.

The categorical approach was first announced in *Taylor v. United States*, 495 U.S. 575, 599–602 (1990). There, the Court held that 18 U.S.C. § 924(e)(2)(B)(ii) -- which provided a sentencing enhancement for a person who "has three previous convictions" for a "violent felony" offense, in that case, "burglary" -- "generally requires the trial court to look only to the fact of conviction and the statutory definition of the prior offense." *Taylor*, 495 U.S. at 600–02 (footnote omitted).

Determining whether to apply the categorical approach requires an exercise in statutory interpretation. *See Ritchie*, 858 F.3d at 209. We must decide whether the provision at issue refers "to an element of a . . . statute," in which case we use the categorical approach, or "to the factual circumstances surrounding commission of the crime on a specific occasion," in which we use the circumstance-specific approach. *Nijhawan v. Holder*, 557 U.S. 29, 33 (2009). However, the "interpretive difficulty" is that "in ordinary speech words such as 'crime,' felony,' 'offense,' and the like sometimes refer to a generic crime, . . . and sometimes refer to the specific acts in which an offender engaged on a specific occasion." *Id*. at 33–34.

*Higgs* addressed the question of whether courts must apply the categorical approach in determining whether a prior conviction involved the use of a firearm under § 3592(c)(2), meaning the court would "only look to the fact of conviction and the statutory definition of the crime of conviction to determine whether a firearm was involved, not to the particular facts of the case." *Higgs*, 353 F.3d at 316 (citing *Taylor*, 495 U.S. at 588–89). Because use of a firearm is not a specific element of the Maryland offenses for which Higgs was convicted, and because he did not specifically admit the use of a firearm, Higgs claimed they should not qualify. *See id.*

We rejected this argument for two reasons. First, we explained that because the language of § 3592(c)(2) "quite plainly requires only that the previous conviction '*involv[e]* the use or attempted or threatened use of a firearm,' it authorizes and likely requires the court to look past the elements of the offense to the offense conduct." *Higgs*, 353 F.3d at 316 (emphasis supplied). Second, we observed that while the Supreme Court in *Taylor* "noted that the categorical approach was proper to avoid 'the practical difficulties and potential unfairness of a factual approach,' the Court has made it clear that an individualized determination *is* required in the death penalty context." *Id.* at 317 (citations omitted) (emphasis in original) (quoting *Taylor*, 495 U.S. at 601).

Since *Higgs*, the Eighth Circuit has concluded the categorical approach should not apply, this time to § 3592(c)(4). *See United States v. Rodriguez*, 581 F.3d 775, 805–07 (8th Cir. 2009). *Rodriguez* noted that the district court in that case agreed with *Higgs* that the word "involving" "suggests fact-finding beyond" the categorical approach. *Id.* at 805. But it recognized that other courts apply the categorical approach to criminal

41

statutes containing the word "involves," ultimately concluding, "[T]he meaning of 'involv[es]' does not resolve the issue." *Id.* at 806 (comparing *United States v. McCall*, 439 F.3d 967, 970 (8th Cir. 2006) (en banc) (applying categorical approach to the residual clause in § 924(e)(2)(B)(ii): "otherwise *involves* conduct that presents a serious potential risk of physical injury to another"), *overruled by Begay v. United States*, 553 U.S. 137 (2008), with *Nijhawan*, 557 U.S. at 32 (declining to apply the categorical approach to statute reaching a conviction that "*involves* fraud or deceit in which the loss to the victim or victims exceeds $10,000" (quoting 8 U.S.C. § 1101(a)(43)(M)(i)) (emphasis supplied)).

Rather than relying on the term "involving," the court turned to examine the structure and language of § 3592(c)(4) and the FDPA. *See Rodriguez*, 581 F.3d at 806. First, *Rodriguez* acknowledged that, unlike sentencing enhancements under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), pursuant to which courts routinely employ the categorical approach, when a § 3592(c) statutory aggravator is proven under the FPDA, a death sentence does not automatically result; the defendant is rather deemed *eligible* for a death sentence. *See* 581 F.3d at 806. The jury still must weigh any aggravating factors against mitigating factors, an individualized balancing that the ACCA does not contemplate. *See id.*

Next, the FDPA "mandates a fact-intensive process in death-eligible proceedings." *Rodriguez*, 581 F.3d at 806. At the penalty phase, the FDPA allows for the introduction of oral testimony, evidence of the effect of the offense on the victim and the victim's family, and a victim impact statement identifying evidence of the extent and scope of

injury and loss. *See id.* But factual inquiry is not permitted under the ACCA. *See Taylor*, 495 U.S. at 601 (noting that, under the ACCA, "the practical difficulties and potential unfairness of a factual approach are daunting"). Indeed, unlike the ACCA context, during the penalty phase of an FDPA matter, a Presentence Report is not prepared, but rather, "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592." *Rodriguez*, 581 F.3d at 806 (quoting § 3593(c)). Moreover, "*Taylor* prohibits relying on witness testimony in ACCA cases; the FDPA expressly permits witnesses to testify." *Id.* at 807. Based on these reasons, the Eighth Circuit joined this court in rejecting the categorical approach to an FDPA prior conviction aggravator. *See id.* n.13 (noting its decision comports with *Higgs*).

Some district courts have followed *Rodriguez*'s reasoning and have held that the categorical approach is inappropriate as applied to § 3592(c)(2). *See, e.g.*, *United States v. Con-ui*, No. 3:13-cr-123, 2017 WL 783437, at *11–12 (M.D. Pa. Mar. 1, 2017) (allowing the circumstance-specific approach because "[t]he objective of the sentencing stage of a capital case is to allow the jury a full appraisal of the defendant," and "the jury should receive 'as much information as possible when it makes the sentencing decision'" (quoting *United States v. Lujan*, 603 F.3d 850, 858 (10th Cir. 2010); *Gregg v. Georgia*, 428 U.S. 153, 203–04 (1976)); *United States v. Basciano*, 763 F. Supp. 2d 303, 348 (E.D.N.Y. 2011) (finding *Rodriguez* to be "well reasoned, . . . persuasive, and [to] appl[y] equally to § 3592(c)(2)"), *aff'd on other issues*, 634 F. App'x 832 (2d Cir. 2015); *United States v. Anh The Duong*, No. CR-01-20154, 2010 WL 275058, at *3 (N.D. Cal. Jan. 14,

2010) ("This Court agrees with the Eighth Circuit's analysis in *Rodriguez*, which comports with the Fourth Circuit's in *Higgs*." (internal quotation marks omitted)). One district court held likewise before *Rodriguez* or *Higgs*. *See United States v. Chong*, 98 F. Supp. 2d 1110, 1121 (D. Haw. 1999) (noting that the FDPA provides for "the introduction of 'any' relevant information in support of aggravating factors," and the Supreme Court "mandate[s] particularize[d] capital sentencing proceedings").

Our research has turned up a single decision holding that the categorical approach should apply to prior conviction aggravators in the eligibility phase. *See United States v. Smith*, 630 F. Supp. 2d 713, 717 (E.D. La. 2007). *Smith* emphasized the distinction between the eligibility and selection phases of the penalty phase: "Statutory aggravating factors are relevant to the *eligibility* phase of capital sentencing, which is to narrow the pool of offenders eligible for death. It is at the *selection* phase that the individualization of the sentencing occurs, likewise the weighing of the aggravating and mitigating circumstances to determine whether a death sentence should in fact be imposed." *Id.* (emphases in original). And "the issue of individualized sentencing is simply not at play in the eligibility phase of a capital sentencing." *Id.* at 718.[11]

---

[11] *Smith* also distinguished *Higgs*, explaining that Smith was originally charged with an aggravated robbery conviction but pled guilty to a robbery conviction; that is, "[i]n effect, he pled out from the alleged use of a firearm." *Id.* at 717. In *Higgs*, however, Higgs "admitted as part of the guilty plea colloquy" that he used a firearm, telling the court at the plea colloquy that the prosecutor accused him of using the *wrong* gun. *See id.* This led *Smith* to hold that, even apart from the propriety of the categorical approach, "allowing evidence of Smith's use of a firearm to prove the statutory aggravating factor alleged, in light of Smith's guilty plea to a lesser charge which did not (Continued)

b.

*Smith* notwithstanding, we find the reasoning of the majority view to be most persuasive.

The categorical approach was born out of the ACCA, and the Supreme Court has gone to great lengths to reiterate the non-factual, element-based nature of ACCA enhancements. Last year in *Mathis v. United States*, the Court explained that in ACCA cases,

> a sentencing judge may look only to the elements of the offense, not to the facts of the defendant's conduct.
>
> That simple point became a mantra in our . . . ACCA decisions. At the risk of repetition (perhaps downright tedium), here are some examples. In *Shepard [v. United States]*: ACCA "refers to predicate offenses in terms not of prior conduct but of prior 'convictions' and the 'element[s]' of crimes." 544 U.S. [13,] 19 [(2005)] (alteration in original). In *James v. United States*: "[W]e have avoided any inquiry into the underlying facts of [the defendant's] particular offense, and have looked solely to the elements of [burglary] as defined by [state] law." 550 U.S. 192, 214 (2007). In *Sykes v. United States*: "[W]e consider [only] the elements of the offense[,] without inquiring into the specific conduct of this particular offender." 564 U.S. 1, 7 (2011) (quoting *James*, 550 U.S. at 202; emphasis in original). And most recently (and tersely) in *Descamps [v. United States]*: "The key [under ACCA] is elements, not facts." 133 S. Ct. [2276], 2283 [(2013)].

136 S. Ct. 2243, 2251–52 (2016) (some alterations, citations, and internal quotation

---

have firearm use as an element nor as part of the factual basis of the plea, would be unfair, unduly prejudicial and confusing to the jury." *Id*. at 718.

45

marks omitted). *Mathis* gave three reasons why an element-only, categorical inquiry is favorable in the ACCA context: (1) the text favors that approach; (2) a judge cannot constitutionally go beyond identifying the crime of conviction and what elements that crime required; and (3) an elements focus avoids unfairness to the defendant. *See id.* at 2252. We find none of these reasons applicable to the FDPA context.

i.

First, while *Descamps* states that when it comes to the ACCA, "the key is elements, not facts," the FDPA stands for the converse: the key is facts, not elements. *See Caro*, 597 F.3d at 626 (4th Cir. 2010) ("[T]he decision whether to select the death penalty should involve 'an individualized determination on the basis of the character of the individual and the circumstances of the crime.'" (quoting *Zant*, 462 U.S. at 879)). For example, the FDPA requires the following procedures aimed at a specific, individualized, fact-based conclusion:

- The FDPA mandates "a separate sentencing hearing to determine the punishment to be imposed." 18 U.S.C. § 3593(b).

- At the hearing, no presentence report is prepared; instead, "information may be presented as to any matter relevant to the sentence," which includes both aggravating and mitigating factors "required to be considered." *Id.* § 3593(c).

- The Government may present "any information relevant to an aggravating factor." *Id.* § 3593(c).

- "Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *Id.*

46

- "The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt." *Id.*

- "The jury . . . shall consider all the information received during the hearing [and] shall return special findings identifying any aggravating factor or factors set forth in [§ 3592] found to exist . . . ." *Id.* § 3593(d).

It is obvious Congress's intent was that information relevant to the particular defendant and his or her particular sentence is fair game in the entirety of the sentencing hearing. Applying the categorical approach, even to one phase of that hearing, flouts this intent.

On this point, Appellant attempts to liken the text of (c)(2) to the type of language *Taylor* held to invoke the categorical approach. But *Taylor* itself distinguished a definition of violent felony that contained the phrase "has as an element," which refers to the elements of statute, from one using the word "involves," which likely refers to "the facts of each defendant's conduct." 495 U.S. at 600–01. Thus, when the FDPA was enacted in 1994, the use of the word "involv[es]" was actually a signal that a fact-based approach was warranted. We have very recently held, in fact, that a provision of the Mandatory Victims Restitution Act referring to "an offense . . . that is . . . an offense against property under [Title 18]" did not warrant the categorical approach because it "contain[ed] no language suggesting that courts look only to the elements of Title 18 statutory offenses.'" *See Ritchie*, 858 F.3d at 210 (quoting *Nijhawan*, 557 U.S. at 37). We likewise find no indication in (c)(2) that courts should look only to the elements of a state conviction involving the use of a firearm.

47

Moreover, under Appellant's reading of § 3592(c)(2), the phrase "involving the use or attempted or threatened use of a firearm" would carry different meanings throughout the penalty phase, which would prove unwieldy. *See Ritchie*, 858 F.3d at 210 (We must "account for practical considerations when determining whether to employ the categorical or circumstance-specific approach." (internal quotation marks omitted)). In Appellant's view, the court would first decide (for example) whether Appellant's Virginia conviction for use of a firearm in a felony categorically "involv[ed] the use or attempted or threatened use of a firearm." § 3592(c)(2). Assuming, arguendo, the court ruled the crime *categorically involved* the use of a firearm, the conviction would be submitted to the jury, which would consider whether the crime *actually involved* the use of a firearm and weigh the circumstances of that crime against mitigating evidence, all of which would require fact-based determinations.

ii.

Second, unless the defendant directs otherwise, the sentencing hearing must be conducted before a jury; therefore, disallowing a judge's legal determination at the outset of the eligibility phase skirts any potential Sixth Amendment problem contemplated by *Mathis*. *See* § 3593(b)(1)–(3). Indeed, in the FDPA context, the jury is specifically required to "determine which [aggravating factors], if any, exist." § 3592(c); *see also* § 3593(d) ("The jury . . . shall return special findings identifying any aggravating factor . . . set forth in [§ 3592] found to exist." (emphasis supplied)). If "an aggravating factor required to be considered under § 3592(c) is found to exist," only then shall "the jury . . . consider whether all the aggravating factor or factors found to exist sufficiently outweigh

48

all the mitigating factor or factors found to exist justify a sentence of death." § 3593(e).

Thus, Congress intended that the jury not only do the weighing process, but also initially find which statutory aggravating factors apply to a particular defendant's sentence. If the court decided a prior conviction did not categorically involve the use of a firearm (if, as Appellant contends and the dissent posits, the Virginia definition of firearm is broader than the federal definition), the statutorily mandated function of the jury is completely usurped.[12]

iii.

Our dissenting colleague believes employing the categorical approach would result in a fairer sentencing process, noting the gravity and seriousness of a death sentence. *See post* at 81–83. He admits that his approach "may render certain defendants who would otherwise be death eligible no longer able to be considered for capital punishment." *Id*. at 90. In our view, however, any perceived fairness conferred to a defendant by use of the categorical approach in the FDPA context must be weighed against Congress's obvious intent, careful delineation of the stages of death penalty sentencing, and the overall purpose of the FDPA.

---

[12] The dissent observes that even if a judge determines a prior conviction involves the use of a firearm, a capital jury must still determine "whether the government has sufficiently proved that the prior convictions exist," thus retaining some role, albeit perhaps a "perfunctory" one. *Post* at 79 & n.6. Under the dissent's view, however, the capital jury's role in the eligibility phase is reduced to superficiality, and we fail to see how this satisfies the "jury's prescribed function" as set forth in § 3592(c) and § 3593(d). *Post* at 80.

Appellant and our dissenting colleague believe we should view the eligibility and selection phases in separate vacuums: although they recognize the FDPA's emphasis on an individualized sentence, they attempt to confine that emphasis to the selection phase only. But the idea that an individualized analysis has no place in the eligibility phase is neither present in, nor contemplated by, the FDPA. For starters, the FDPA does not mandate trifurcated proceedings, meaning that courts are not required to separate the eligibility and selection inquiries into two separate hearings. In fact, we have held the Constitution does not require trifurcation. *See Booth-El v. Nuth*, 288 F.3d 571, 582–83 (4th Cir. 2002) (rejecting argument that denial of request for trifurcation violates due process); *see also United States v. Fell*, 531 F.3d 197, 240 (2d Cir. 2008).

And holding that the categorical approach should apply in this case, but not a case with a bifurcated proceeding, like *Higgs*, could have untoward (and ultimately unfair) consequences. Generally, instead of requiring the Government consent to trifurcation, courts have followed normal motion practice procedure, taking each side's arguments in turn. There are many reasons a defendant would desire trifurcation and an eligibility hearing first; for example, in the case at hand, evidence of the Zion crimes only came in at the selection phase, decreasing the potential for prejudice in the eligibility phase. But holding that the categorical approach should apply as a matter of law in the eligibility phase would surely discourage any zealous prosecutor from consenting to a trifurcated proceeding. *See, e.g.*, *United States v. Bolden*, 545 F.3d 609, 618–19 (8th Cir. 2008); *United States v. Johnson*, 362 F. Supp. 2d 1043, 1099 (N.D. Iowa 2005), *aff'd in part*, 495 F.3d 951 (8th Cir. 2007) (noting defendant's motion for trifurcation "became one of

50

the most contentious" motions before the court).

Finally, we cannot ignore the Supreme Court's admonition that the statutory aggravators "must *genuinely* narrow the class of persons eligible for the death penalty." *Zant*, 462 U.S. at 877 (emphasis supplied). The dissent is correct that its approach would narrow the class of persons eligible for the death penalty, but any such narrowing must also be genuine -- that is, it must be done in an "objective, evenhanded, and substantively rational way." *Caro*, 597 F.3d at 623 (quoting *Zant*, 462 U.S. at 879).

The death penalty is reserved "for the most culpable defendants committing the most serious offenses," *Miller v. Alabama*, 132 S. Ct. 2455, 2467 (2012), but under the categorical approach, the judge would "presume" that the prior conviction "rested upon nothing more than the least of the acts criminalized" under the criminal statute at issue, *Mellouli v. Lynch*, 135 S. Ct. 1980, 1986 (2015) (quoting *Moncrieffe v. Holder*, 133 S. Ct. 1678, 1684–85 (2013)); *accord Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1568 (2017). We fail to see how the categorical approach, which focuses on the least culpable act proscribed by statute rather than the particular culpability of a defendant, narrows in any *genuine* way the type of defendants who should be eligible for a death sentence.[13]

---

[13] We take issue with the dissent's suggestions that it is "bizarre," "especially strange," and somehow "twists death penalty jurisprudence" to hold both (1) that permitting post-offense convictions to qualify as previous convictions can "narrow the class of all murderers to only murderers with previous convictions," and (2) that the categorical approach does not "genuinely narrow" the class of persons eligible for the death penalty. *Post* at 81–82. Believing the former certainly does not preclude believing the latter. *Higgs* has already decided that using post-offense convictions genuinely narrows the class of murderers to those murderers who received a qualifying conviction before sentencing. *See Higgs*, 353 F.3d at 318 (suggesting prior conviction aggravators (Continued)

iv.

Finally, we address the Supreme Court's decisions in *James v. United States*, 550 U.S. 192 (2007), and *Johnson v. United States*, 135 S. Ct. 2551 (2015), upon which our dissenting colleague relies. The *James* Court applied the categorical approach to the ACCA's now-defunct residual clause, which provided a sentencing enhancement for a prior conviction that "involves conduct that presents a serious potential risk of physical injury to another." *See* 550 U.S. at 201–02 (quoting 18 U.S.C. § 924(e)(2)(B)(ii)). Appellant suggests and the dissent proclaims that *James*, and the Court's subsequent reaffirmation and explanation of the categorical approach in *Johnson*, implicitly overruled *Higgs*'s holding on the categorical approach issue. *See post* at 66; *see also* Appellant's Br. 59–60.

It is true that *Higgs* relied on the term "involv[e]" to demonstrate that a fact-specific inquiry was warranted, while *James* held that crimes defined by types of conduct "involved," especially within the ACCA, are susceptible to the categorical approach. *See James*, 550 U.S. at 202 (noting that the Court had taken the categorical approach "with respect to other offenses under ACCA"). But we are not convinced that *James* overruled *Higgs* on this point. To begin, the *Higgs* court was careful to state that the use of the

_____

"do[] not concern matters directly related to the death penalty offense [but] [r]ather [are] concerned with the characteristics of the offender as of the time that he is sentenced"). But the categorical approach prohibits consideration of previous offenses as a "characteristic[]" of the defendant; rather, it places the defendant's prior history in a generic vacuum. As such, it is not a "genuine" narrowing of murderers to death-eligible murderers.

52

word "involving" "authorizes and *likely* requires the court to look past the elements of the offense." 353 F.3d at 316 (emphasis supplied). *Higgs* in no way held that any statute using the word "involving" *precluded* the categorical approach, and *James* in no way held that any statute containing that word *required* the categorical approach. For example, elsewhere in § 3592(c), Congress uses the word "involved" in the context of a plainly non-categorical statutory aggravators. *See, e.g.,* § 3592(c)(6) ("The defendant committed the offense in an especially heinous, cruel, or depraved manner in that it *involved* torture or serious physical abuse to the victim." (emphasis supplied)); § 3592(c)(13) ("The defendant committed the offense in the course of engaging in a continuing criminal enterprise in violation of [21 U.S.C. § 848(c)], and that violation *involved* the distribution of drugs to persons under the age of 21 . . . ." (emphasis supplied)). In other words, the word "involves" can still "authorize[]" courts to look past the elements of the offense. Therefore, *Higgs* and *James* can coexist.[14]

As for *Johnson*, that decision stated, "*Taylor* explained that the relevant part of the [ACCA] refers to 'a person who . . . has three previous convictions' for -- not a person who has committed -- three previous violent felonies or drug offenses," and "[t]h[e] emphasis on convictions indicates that Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain

---

[14] The dissent also states that the word involving "on its own" cannot signify that the categorical approach is inappropriate. *Post* at 66. But *Higgs* did not rely on that word alone; it also noted the "individualized determination" required in the death penalty context. *See* 353 F.3d at 317.

categories, and not to the facts underlying the prior convictions." 135 S. Ct. at 2562 (citations and internal quotation marks omitted). Although § 3592(c)(2) is written in terms of a person "ha[ving] previously been convicted of" a certain crime, rather than a person "who has committed" a certain crime, *Johnson*'s analysis was specifically couched in terms of the ACCA, and as discussed above, there are ample reasons the categorical approach is suitable to the ACCA and not the FDPA. Therefore, we cannot say *Johnson* has overruled *Higgs* either.

In any event, our analysis does not rise and fall on the *Higgs* decision. As the Eighth Circuit stated, the meaning of "involving" simply "does not resolve the issue." *Rodriguez*, 581 F.3d at 806. We find the reasoning of *Rodriguez*, its progeny, *Mathis*, and the language of the FDPA itself most persuasive and supportive of *Higgs*'s ultimate resolution on this point. Therefore, we conclude the categorical approach does not apply to § 3592(c)(2).

2.

Application

Having decided the categorical approach does not apply, we conclude that the Arlington crimes clearly qualify as prior convictions of violent felonies involving a firearm pursuant to § 3592(c)(2). For the events occurring on February 27, 2010, Appellant was convicted of, inter alia, use of a firearm in a felony, and breaking and entering while armed. Any challenge Appellant brings regarding whether these convictions "involv[ed] the use or attempted or threatened use of a firearm . . . against another person" is basically a sufficiency challenge that must fail. § 3592(c)(2).

54

Both J.T. and K.M. testified that Appellant had a firearm, and we have held, "Eyewitness testimony is sufficient to prove that a person used a firearm." *United States v. Redd*, 161 F.3d 793, 797 (4th Cir. 1998). The Government need not "present expert testimony" that a defendant's putative firearm was "capable of expelling a projectile . . . absent some indication that the firearm was a fake." *McNeal*, 818 F.3d 141, 149 (4th Cir. 2016) (citing *United States v. Jones*, 907 F.2d 456, 460 (4th Cir. 1990)). "[L]ay testimony of eyewitnesses that a gun was used in [an offense] is a sufficient basis for the jury to find that a 'firearm' was used" during the offense. *Id.* (internal quotation marks omitted). The evidence showed that Appellant owned a Glock 22, and that his Glock was designed to expel a projectile using an explosive, *see id.* at 4437 (testimony of Officer Keith Ahn), satisfying the federal definition of a firearm. *See* 18 U.S.C. § 921(a)(3)(A). And it is without question that Appellant attempted or threatened to use the firearm on both J.T. and M.N. by showing them the gun and forcing them to perform certain acts. Therefore, Appellant's convictions regarding the February 27 conduct satisfy § 3592(c)(2), making Appellant death eligible.

C.

Competency Evaluation

Appellant also contends that the district court erred by allowing him to forego challenges to the Government's eligibility and selection phase evidence and allowing him to waive a mitigation defense without "first determining his competency to make those decisions." Appellant's Br. 112. We review a court's failure to conduct a competency hearing or evaluation for abuse of discretion. *See United States v. Mason*, 52 F.3d 1286,

55

1289 (4th Cir. 1995). We "may not substitute [our] judgment for that of the district court; rather, we must determine whether the court's exercise of discretion, considering the law and the facts, was arbitrary or capricious." *Id.*

During the course of the pre-trial proceedings, Appellant persistently urged the court to allow him to represent himself, citing disputes with counsel. In early 2013, the district court *sua sponte* ordered a competency evaluation, the results of which were outlined in a letter to the district court on February 19, 2013, approximately one year before trial began.

Psychiatrist Richard Ratner conducted the evaluation, which was comprised of a three hour jail interview with Appellant and lengthy discussions with three attorneys who knew or had worked with Appellant. Dr. Ratner did not conduct an extensive evaluation of Appellant's previous psychiatric history or his developmental, family, social, educational, occupational, legal, and substance use history. Dr. Ratner's letter mentions that Appellant had been examined by two other mental health professionals, but he neither requested nor had access to the results of that testing. Nonetheless, Dr. Ratner concluded that Appellant did not suffer from a diagnosable mental illness, was fully competent to stand trial, and had the requisite mental and psychological capacity to represent himself.

Notably, Dr. Ratner's letter explained that Appellant had a strong aversion to discussing his personal history and a strong opposition to pursuing a mitigation defense. He questioned Appellant's judgment on these points, but explained that his choices should not have as significant an effect on the guilt phase. He noted, however, that if a

56

question of competency was raised at the penalty phase, the court could deal with that issue at a later time.

Three days after the competency evaluation letter was written, the district court held a hearing in which Appellant himself stated it was probably "not in my best interests [sic] to represent myself." Appellee's Br. 95 (quoting sealed J.A.). The district court, after hearing from counsel and reviewing Dr. Ratner's letter, determined Appellant was competent to stand trial and granted a request for substitute counsel, who represented Appellant throughout the guilt phase.

After Appellant was found guilty, he again clashed with counsel over whether to present mitigation evidence in the penalty phase. The district court held an ex parte hearing and asked defense counsel, "Have you seen a change in the mental health of Mr. Torrez over the last year?" Counsel responded that he and his co-counsel were "unable to file an affidavit that says [Appellant] is not competent." J.A. 4400–01. The district court also stated that it had "checked with the Alexandria Detention Center to see whether there were any kind of incidents or any notes regarding a change in [Appellant's] mental health, and they could not identify any." *Id.* at 4401. The court then directed counsel to outline the mitigation case it would present, questioned Appellant at length, and ultimately found Appellant to be competent and allowed him to go forward with standby counsel present at the penalty phase.

Appellant now contends that the district court should have ordered a second competency evaluation and hearing before allowing Appellant to proceed to sentencing with only standby counsel and before he made the choice to present no mitigation

evidence whatsoever.

At any time prior to sentencing a defendant, the district court "shall order [a competency] hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him." 18 U.S.C. § 4241(a); *see also United States v. Moussaoui*, 591 F.3d 263, 291 (4th Cir. 2010). The well-established test for competence is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam) (internal quotation marks omitted). "To prevail, the defendant must establish that the trial court ignored facts raising a bona fide doubt" regarding competency. *Walton v. Angelone*, 321 F.3d 442, 459 (4th Cir. 2003) (internal quotation marks omitted).

Appellant contends that the district court was presented with several facts that mandated a court-ordered competency evaluation and hearing: defense counsel's alleged "somewhat equivocal opinion" that Appellant was competent, Appellant's Br. 114; defense counsel's view that Appellant's decision to forego a mitigation defense was irrational; the 2013 competency evaluation applied only to the guilt phase, and Appellant's mental state in 2014 was "exacerbated by the stress of a capital trial," *id*.; the Government recommended another competency evaluation in the event of an appellate waiver; and there were "red flags" that Appellant was not competent, *id*. at 116.

58

We have reviewed these circumstances and conclude the district court did not abuse its discretion in failing to order a second evaluation and hearing. Defense counsel's opinion about Appellant's competency was unequivocal, and we have recognized a defendant can make a "rational choice" to forego a mitigation defense. *Chandler v. Greene*, 1998 WL 279344, at \*8 (4th Cir. May 20, 1998) (quoting *Rees v. Peyton*, 384 U.S. 312, 314 (1966) (per curiam)). We also reject the notion that a defendant's desire to "fight the case" at the guilt stage makes per se irrational his decision to forego a mitigation defense at the penalty phase, once he has in fact been convicted. J.A. 4398. In addition, although the 2013 competency evaluation was conducted for purposes of the guilt phase, Dr. Ratner nonetheless mentioned Appellant's desire that his counsel withhold investigation of mitigation evidence, and explained that while it "may" lead to a question of competency at the penalty phase, it was not a "manifestation of a diagnosable mental illness." Appellee's Br. 95 (quoting sealed J.A.).

In addition, the Government's request for a second competency evaluation came in its Position on Sentencing, and was made in the distinct context of a potential appellate waiver. Indeed, in that filing, the Government acknowledged, "[N]o . . . showing [of a mental disease or defect] has been made with respect to the defendant." J.A. 5246 n.1. Finally, the "red flags" mentioned by Appellant were either present before the 2013 evaluation, mentioned in the context of a wholly different issue in the case, or wholly non-probative of Appellant's mental state. Therefore, Appellant has failed to demonstrate that the district court "ignored facts raising a bona fide doubt" regarding his competency, and we reject his arguments on this point. *Walton*, 321 F.3d at 459 (internal

59

quotation marks omitted).

D.

Other Sentencing Arguments

We have reviewed Appellant's remaining sentencing arguments: whether Appellant's Fifth Amendment rights were violated when the Government submitted and failed to correct allegedly false or misleading evidence in the eligibility phase; aside from the competency issue discussed above, whether the district court otherwise erred in allowing Appellant to waive his right to contest or rebut the Government's case in the eligibility and selection phases of the sentencing trial; and whether the Eighth Amendment barred the admission of evidence of the Zion murders in the selection stage. We find each of these arguments to be without merit.

V.

Conclusion

For the foregoing reasons, we find no reversible error as to the issues raised by Appellant. We are also satisfied that (1) the evidence clearly "supports the special finding of the existence of an aggravating factor required to be considered under section 3592," and (2) the sentence of death was not "imposed under the influence of passion, prejudice, or any other arbitrary factor." 18 U.S.C. § 3595(c)(1). Accordingly, we affirm Appellant's conviction and death sentence.

*AFFIRMED*

DIAZ, Circuit Judge, concurring:

I concur in Judge Thacker's thorough opinion in this case, save for footnote 10. Specifically, I see no need to second-guess our previous holding in *United States v. Higgs* that conduct occurring after the commission of a capital offense can make a defendant eligible for the death penalty. In my view, *Higgs* presented compelling justifications, rooted in the Federal Death Penalty Act's language, for considering all conduct occurring before the sentencing phase of a capital case.

FLOYD, J., concurring in part and dissenting in part:

I agree with my colleagues in the majority that none of Appellant Jorge Torrez's complaints with respect to his trial merit reversal. However, I would find that Torrez was ineligible for the death penalty and accordingly vacate his death sentence and remand for resentencing. Therefore, while I concur in Parts I–III of the majority opinion, as well as Part IV.A and Part IV.C, I must dissent from the remainder of Part IV and the ultimate conclusion in Part V.

I.

The majority opinion adequately lays out the facts and the basic premises of the Federal Death Penalty Act (FDPA), 18 U.S.C. §§ 3591–98, and they need not be repeated in depth here. I thus restate only the most relevant information. The FDPA contains sixteen enumerated aggravating factors for a defendant convicted of homicide, which generally relate to either characteristics of the defendant, the offense, or the victim. *See* 18 U.S.C. § 3592(c)(1)–(16). At the end of this list is a catchall, known as the "non-statutory aggravator," that permits the jury to "consider whether any other aggravating factor for which notice has been given exists." *Id.* § 3592(c). We concern ourselves today with two of the five statutory aggravators that deal with previous convictions for those convicted of homicide—§ 3592(c)(2) and (c)(4).[1]

---

[1] 18 U.S.C. § 3592(c)(3), (c)(10), and (c)(12) are also concerned with previous convictions. Statutory aggravators related to prior convictions also exist for capital defendants accused of crimes other than homicide. *See* 18 U.S.C. § 3592(b)(1) & (d)(1)–(3).

The government proceeded against the Appellant Jorge Torrez in this FDPA case on the exclusive basis of those two statutory aggravating factors. Torrez was convicted and found death eligible by the jury on the basis of these two statutory aggravators, and subsequently the jury recommended he be sentenced to death.

## II.

Although I have concerns about the appropriateness of using post-offense conduct as "previous convictions," I share the majority's view that we are bound by *United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003), with respect to this challenge. *See ante* at 22–39.[2] Where I part ways with my colleagues in the majority is in their belief that the holding in *Higgs* with respect to the categorical approach was not implicitly overruled by the Supreme Court. *See ante* at 40–44, 52–54. I would find that (1) the holding regarding the categorical approach in *Higgs* was overruled implicitly by the Supreme Court in

---

[2] In joining the majority's conclusion in Part IV.A, I note that the holding from *Higgs* on this issue appears contrary to our conclusions in other contexts. *See, e.g.*, *United States v. Pressley*, 359 F.3d 347, 351 (4th Cir. 2004) ("Unlike the sentencing date, the violation date is not subject to the whims of the court's docket nor vulnerable to manipulation by either party. Rather, it would be 'absurd' to adopt an interpretation, not supported by the plain text of the statute, which would subject a defendant to a mandatory fifteen-year minimum sentence based on the mere fortuity of his sentencing date."). However, I also acknowledge that to the extent *Pressley* and *Higgs* are viewed to be in conflict on this holding, *Higgs* would control under the earliest-case-governs rule. *See McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) (en banc) ("When published panel opinions are in direct conflict on a given issue, the earliest opinion controls, unless the prior opinion has been overruled by an intervening opinion from this court sitting *en banc* or the Supreme Court.").

*James v. United States*, 550 U.S. 192 (2007);[3] (2) the categorical approach *does* apply to determining whether a conviction can satisfy 18 U.S.C. § 3592(c)(2) or (c)(4); and (3) Torrez's convictions for the Arlington Offenses do not satisfy either 18 U.S.C. § 3592(c)(2) or (c)(4) and thus Torrez is ineligible for the death penalty. Accordingly, I would vacate his death sentence and remand this case for resentencing.

### A.

The categorical approach was first announced in *Taylor v. United States*, 495 U.S. 575, 599–602 (1990)—four years before the passage of the FDPA. In *Taylor*, the Court considered 18 U.S.C. § 924(e), one of the penalty provisions of the Armed Career Criminal Act (ACCA), which provides a sentence enhancement "[i]n the case of a person who . . . has three previous convictions . . . for a violent felony or a serious drug offense, or both." 18 U.S.C. § 924(e)(1). The Court in *Taylor* found that the language of the statute indicated that Congress wanted the focus of this sentencing enhancement to be focused on the fact of conviction, rather than the facts underlying the convictions. 495 U.S. at 600. As the Court explained:

> Section 924(e)(1) refers to "a person who . . . has three previous convictions" for—not a person who has committed—three previous violent felonies or drug offenses. Section 924(e)(2)(B)(i) defines "violent felony" as any crime punishable by imprisonment for more than a year that "has as an element"—not any crime that, in a particular case, involves—the use or threat of force.

---

[3] *James* was later overruled on other grounds by *Johnson v. United States*, 135 S. Ct. 2551 (2015).

*Id.* The Court went on to further find that the legislative history "show[ed] that Congress generally took a categorical approach to predicate offenses," and that there would be "practical difficulties and potential unfairness" in applying a factual approach to determining whether previous convictions fit within the defined "violent felonies" in the ACCA. *Id.* at 601–02.

In rejecting the categorical approach for 18 U.S.C. § 3592(c)(2), the court in *Higgs* relied on the distinction drawn in *Taylor* to find that the language used in (c)(2) did not support applying the categorical approach. *See Higgs*, 353 F.3d at 316–17. The court explained that "[b]ecause the language [of (c)(2)] quite plainly requires only that the previous conviction 'involv[e] the use or attempted or threatened use of a firearm," it authorizes and likely requires the court to look past the elements of the offense to the offense conduct." *Id.* at 316 (third modification in original).

However, three and half years after our decision in *Higgs*, the Supreme Court issued its opinion in *James*. In *James*, the Court expressly stated that it would apply the categorical approach of *Taylor* in determining whether an offense was one that "involves conduct that presents a serious potential risk of physical injury to another." 550 U.S. at 201–02 (quoting 18 U.S.C. § 924(e)(2)(B)(ii)). To further clarify, the Court explained it would "consider whether the *elements of the offense* are of the type that would justify [the offense's] inclusion within [18 U.S.C. § 924(e)(2)(B)(ii)], without inquiring into the specific conduct of this particular offender." *Id.* at 202.

Subsequently, in *Johnson*, the statutory language that had been at issue in *James* was deemed unconstitutionally vague. 135 S. Ct. at 2557. In reaching this conclusion,

the Court responded to the dissenting Justices' suggestion that the provision could be saved by simply abandoning the categorical approach. The Court stated that this was not an option, for the categorical approach was clearly applicable. The Court explained that the determination of whether the categorical approach should apply is based on the language referring to "a person who . . . has three previous convictions," and *not* on the language in the ACCA that defines a violent felony as "ha[ving] as an element" the use or threatened use of force. *Id.* at 2562 (citing *Taylor*, 495 U.S. at 600).

The majority concludes that the holdings of *James* and *Johnson* have not implicitly overruled our holding in *Higgs*. *Ante* at 52–54. I cannot agree. Our holding in *Higgs* was that the (c)(2) aggravator contains the word "involving," which precludes application of the categorical approach. 353 F.3d at 316–17. This sole premise has been wholly undermined by the Supreme Court's use of the categorical approach in *James* for a statute that similarly used the word "involves." After *James* and the emphasis of the word "conviction" in *Johnson*, it cannot be said that the word "involving"—on its own— signifies that the categorical approach is inappropriate.

As the majority points out, some statutes using the word "involving" are analyzed under the categorical approach, and some statutes using the word "involving" are not. *See ante* at 53.[4] But this is itself evidence that *Higgs* is no longer good law with respect

---

[4] The majority reasons that Congress used the word "involved" in other aggravators that are clearly not susceptible to the categorical approach. *Ante* at 53. This point, while correct, is inapposite. Both of the aggravators that do so—§ 3592(c)(6) & (c)(13)—are focused on characteristics of the offense of conviction and not characteristics of the defendant as in (c)(2) and (c)(4). It would be nonsensical for the (Continued)

66

to this contested holding.  Under the logic of *Higgs*, this disparity would be impossible; *Higgs* dictates that *no* statute using the word "involving" could be subject to the categorical approach.  Notably, in reaching this conclusion I am not claiming that the implied overruling of *Higgs* by *James* dictates that the categorical approach *must* be applied—the overruling only means that we must consider the issue anew.

The majority cites to the Eighth Circuit's decision in *United States v. Rodriguez*, 581 F.3d 775, 806 (8th Cir. 2009), in support of its conclusion that *Higgs* has not been overruled.  To the contrary, *Rodriguez* only serves to undermine the idea that *Higgs* has not been implicitly overruled in this respect.  In *Rodriguez*, the court noted, "the meaning of 'involving' does not resolve the issue."  581 F.3d at 806.  Then, the court in *Rodriguez* went on to determine that the categorical approach did not apply based on the structure and language of the statute, but did not base that conclusion solely on the word "involving."  *Id.* at 806–07.  This is in stark contrast to our analysis in *Higgs*, which, as explained above, was based on the word "involving" alone.  *Rodriguez* demonstrates that the word "involving" is not the end of inquiry when it comes to the categorical approach; this is fully consistent with my understanding of *James*.  Again, I do not claim that *James* signifies that the word "involving" dictates the use of the categorical approach.  I simply

categorical approach to apply to characteristics of the offense of conviction, but applying the categorical approach to characteristics of the defendant is exactly what we do in the ACCA context and what we should do here as I explain further in Section II.B, *infra*.

believe *James* signifies that the word "involving" cannot by itself dictate anything—examination of other factors will always be necessary.

Further, at least one district court has expressly called into question our holding in *Higgs*, declining to rely on it due to the Supreme Court's holding in *James*. *See United States v. Basciano*, 763 F. Supp. 2d 303, 347 (E.D.N.Y. 2011), *aff'd on other issues*, 634 F. App'x 832 (2d Cir. 2015). Another district court has expressly disagreed with our logic in *Higgs* for the reasons later espoused by the Court in *James*. *See United States v. Sablan*, 555 F. Supp. 2d 1177, 1191 (D. Colo. 2006) (rejecting the word "involved" as a basis for distinguishing the FDPA from the ACCA, and noting "[t]his [was] the distinction that *Higgs* relied on").

At bottom, *Higgs* relied exclusively on the fact that the previous conviction for a firearm offense aggravator at (c)(2) includes offenses that "involv[e] the use or attempted or threatened use of a firearm . . . against another person." The Supreme Court in *James* and *Johnson* has disavowed the idea that the word "involve" alone can render a sentencing enhancement provision immune from the categorical approach. Accordingly, I would find that *James* and *Johnson* have implicitly overruled our conclusion in *Higgs* that the categorical approach does not apply to (c)(2), and start my analysis on this issue from a blank slate.

## B.

Turning now to whether the categorical approach applies to previous convictions for the aggravators in 18 U.S.C. § 3592(c)(2) and (c)(4), I would find that it does. The

majority rightly points out that authority on this issue is scant. *See ante* at 41–44. The only circuits to weigh in thus far have been this Court and the Eighth Circuit, and then a smattering of district courts. The majority of courts to opine on this issue have concluded that the categorical approach would not apply; however, the majority is not always right.

1.

To provide context for why I do not agree with the view of the majority opinion here, I briefly review the Supreme Court's death penalty jurisprudence. The Court has broken down the penalty phase of capital sentencing into two different phases—eligibility and selection. *Tuilaepa v. California*, 512 U.S. 967, 971 (1994); *see also Jones v. United States*, 527 U.S. 373, 376–79 (1999) (explaining procedures under the FDPA and discussing how the jury must unanimously find eligibility before it can proceed to the selection decision). At the eligibility phase, "the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent)." *Tuilaepa*, 512 U.S. at 972. Then, the Court has "imposed a *separate* requirement for the *selection* decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence." *Id.* (emphasis added). "What is important *at the selection stage* is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879 (1983) (first emphasis added, second emphasis in original). As noted by the Court, "[t]he objectives of these two inquiries can be in some tension, at least when the inquiries occur at the same time." *Tuilaepa*, 512 U.S. at 973.

2.

In reaching its conclusion, the majority relies on opinions from courts that reject the categorical approach by relying on the Supreme Court's requirement that death penalty sentencing be individualized. *See ante* at 43–44; *Rodriguez*, 581 F.3d at 806–07 ("[T]he FDPA mandates a fact-intensive process in death-eligible proceedings. . . . Beyond the FDPA, the factual inquiry required in death penalty cases has constitutional significance."); *United States v. Con-ui*, No. 13-cr-123, 2017 WL 783437, at \*11–12 (M.D. Pa. Mar. 1, 2017) (relying on *Zant* and the cases cited here to explain that the individualized sentencing requirement in capital punishment precludes application of the categorical approach); *Basciano*, 763 F. Supp. 2d at 348 (adopting *Rodriguez* in whole on this issue); *United States v. Anh The Duong*, No. CR-01-20154, 2010 WL 275058, at \*3 (N.D. Cal. Jan. 14, 2010) (same); *United States v. Chong*, 98 F. Supp. 2d 1110, 1120 (D. Haw. 1999) ("Defendant's argument that the statute provides that the jury is only to consider the fact of conviction, rather than the conduct underlying the conviction, flies in the face of the Supreme Court's mandate to particularize capital sentencing proceedings."). Each of these cases cites to *Zant* or its progeny in support of this idea, but as is clear from the language of *Zant* itself, the individualized determination is necessary at the *selection* phase—not the *eligibility* phase.

The only court to appreciate and give meaning to this distinction is the opinion of the district court in in *United States v. Smith*, 630 F. Supp. 2d 713 (E.D. La. 2007). As the court there recognized, "the issue of individualized sentencing is simply not at play in the eligibility phase of capital sentencing." *Smith*, 630 F. Supp. 2d at 718. The court

70

explained, "It is at the *selection* phase that the individualization of the sentencing occurs, likewise the weighing of the aggravating and mitigating circumstances to determine whether a death sentence should in fact be imposed." *Id.* at 717. In contrast, the purpose of the eligibility phase "is to narrow the pool of offenders eligible for death." *Id.* And, as emphasized by Justice Blackmun in a powerful dissent, the point of the individualized approach in capital sentencing is to "afford[] the sentencer the power and discretion to grant mercy in a particular case, and provid[e] avenues for the consideration of any and all relevant mitigating evidence that would justify a sentence less than death." *Callins v. Collins*, 510 U.S. 1141, 1144 (1994) (Blackmun, J., dissenting). This point was further underscored in *Kansas v. Marsh*, 548 U.S. 163 (2006), where the Court explained that:

> [A] state capital sentencing system must: (1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime.

*Marsh*, 548 U.S. at 173–74 (citing *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (opinion of Stewart, Powell, and Stevens, JJ.). Thus, the clear purpose of individualized sentencing is for the selection stage once the defendant has become a "death-eligible defendant." To flip the individualized sentencing requirement on its head and use it as a means to find a defendant death eligible perverts the requirement and renders it unrecognizable.

The majority resists this conclusion, and instead finds that that the legal distinction between eligibility and selection "is neither present in, nor contemplated by, the FDPA." *Ante* at 50. I cannot agree. Although not expressly laid out, the FDPA first requires a

71

unanimous finding by the jury of at least one statutory aggravator in order to consider whether the defendant may be sentenced to death. *See* 18 U.S.C. § 3593(d)–(e). Further, it is only once the defendant has been found death eligible pursuant to one of the statutory aggravators listed in 18 U.S.C. § 3592 that the jury may proceed to consider any non-statutory aggravators and any mitigation evidence proffered by the defendant. *See Jones*, 527 U.S. at 377–78 & n.2; *see also* 18 U.S.C. § 3593(d)–(e). No one can dispute that mitigation evidence and non-statutory aggravator evidence cannot be considered by the jury in its eligibility phase decision; even the government itself has conceded below that different constitutional protections attach at eligibility and selection. J.A. 122–23 ("The clear implication of the holding [in *Ring*] was that eligibility and selection *were distinct components of the process*, with the former being subject to, among other things, various constitutional requirements." (emphasis added)).

Thus, I cannot agree with the majority's conclusion that the FDPA does not provide for a difference between eligibility and selection. Rather, I believe that those are two different issues, involving distinct burdens and types of evidence available for consideration, and the jury must be instructed accordingly on what it may consider and how to reach each conclusion.[5]

---

[5] Because of the differences between the eligibility and selection phases, separate proceedings—as took place here—are, if not required, at least recommended. *See Tuilaepa*, 512 U.S. at 973 (noting that conducting eligibility and selection phases jointly can result in "some tension").

72

3.

Having concluded that there is a meaningful difference between the eligibility and selection phases that must be factored into this decision, I now move on to the question of whether we should apply the categorical approach to the (c)(2) and (c)(4) statutory aggravators. I conclude that we should.

As the majority discusses, the ACCA is the original source of the categorical approach. *See ante* at 45–46. But the categorical approach is not limited to the ACCA. It applies in the context of immigration cases, *see, e.g.*, *Gonzalez v. Duena-Alvarez*, 549 U.S. 183, 186 (2007), to determining crimes of violence under the Sentencing Guidelines, *see, e.g.*, *United States v. Montes-Flores*, 736 F.3d 357, 364 (4th Cir. 2013), and to determining crimes of violence under 18 U.S.C. § 16 and the myriad statutes that incorporate that definition, *see, e.g.*, *Karimi v. Holder*, 715 F.3d 561, 567 (4th Cir. 2013).

Determining whether the categorical approach should be applied is a matter of statutory interpretation. In interpreting the statute, we examine the text to determine whether Congress intended to "refer[] to a generic crime, or . . . to the specific way in which an offender committed the crime on a specific occasion." *Nijhawan v. Holder*, 557 U.S. 29, 34 (2009).

The Supreme Court has often explained the rationales for applying the categorical approach to the ACCA, doing so most recently in *Mathis v. United States*, 136 S. Ct. 2243, 2252–53 (2016): (1) the text favors that approach by referring to "a defendant who has three 'previous convictions' . . . rather than one who has . . . committed that crime;" (2) Sixth Amendment concerns in permitting a judge at sentencing to find facts beyond

73

the fact of conviction; and (3) perceived unfairness to defendants posed by a contrary approach. *Id.* These rationales guide the following analysis of the statutory language at issue in this case.

a.

I turn first to the text. When a statutory scheme "asks what offense the [defendant] was 'convicted' of," our focus must move to an elements-based approach, as "'[c]onviction' is 'the relevant statutory hook.'" *Moncrieffe v. Holder*, 133 S. Ct. 1678, 1685 (2013) (quoting *Carachuri-Rosendo v. Holder*, 130 S. Ct. 2577, 2588 (2010)) (first modification added, second in original). Applying this standard here, it is clear that the categorical approach should be applied. In 18 U.S.C. § 3592(c)(2) and (c)(4), the focus of the statute is on "conviction" and on what offense the defendant has been convicted of, rather than on what specifically the defendant did.

By eliding the difference between eligibility and selection, the majority reads the FDPA to require a fact-intensive inquiry. *See ante* at 46 (citing *United States v. Caro*, 597 F.3d 608, 626 (4th Cir. 2010), in turn quoting *Zant*, 462 U.S. at 879). As explained above, however, this is not so at the eligibility phase. The majority then reiterates the holding of *Higgs* that the word "involves" in (c)(2) and (c)(4) necessitates a circumstance specific analysis. *See ante* at 47. Again, for the reasons explained above, *James* and *Johnson* have squarely rejected this conclusion.

The text of the FPDA clearly focuses on a person's having been convicted, and *not* on the committed conduct. A comparison of the statutory language in the FDPA and that

in the ACCA and the INA—where we do apply the categorical approach—is illuminating:

- "[T]he defendant *has previously been convicted* of a Federal or State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm (as defined in section 921) against another person." 18 U.S.C. § 3592(c)(2) (emphasis added) (FDPA).

- "The defendant *has previously been convicted* of 2 or more Federal or State offenses, punishable by a term of imprisonment of more than 1 year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person." *Id.* § 3592(c)(4) (emphasis added) (FDPA).

- "In the case of a person who violates section 922(g) of this title and *has three previous convictions* by any court . . . for a violent felony or a serious drug offense, or both . . . such person shall be fined under this title and imprisoned not less than fifteen years . . . ." *Id.* § 924(e)(1) (emphasis added) (ACCA).

- "Any alien who *is convicted* of an aggravated felony at any time after admission is deportable." 8 U.S.C. § 1227(a)(2)(A)(iii) (emphasis added) (INA).

There can be no meaningful textual difference between "has previously been convicted" as is found in the FDPA, "has . . . previous convictions," as is found in the ACCA, and "is convicted" as found in the INA. The majority focuses on drawing out distinctions between the FDPA and the ACCA, but never addresses the stark textual similarity that exists between the FDPA and the INA.

Further illustrating the importance of this textual analysis are the Court's holdings in *Nijhawan v. Holder*, 557 U.S. 29 (2009) and *Kawashima v. Holder*, 565 U.S. 478 (2012), two different cases interpreting a provision of the Immigration and Nationality Act (INA), 8 U.S.C. § 1101, *et seq.* The INA provides that "Any alien who is convicted

75

of an aggravated felony at any time after admission is deportable." 8 U.S.C. § 1227(a)(2)(A)(iii). The INA then goes on to define "aggravated felony" in a number of ways, one of which is "an offense that [1] involves fraud or deceit [2] in which the loss to the victim or victims exceeds $10,000." *Id.* § 1101(a)(43)(M)(i). Interestingly, the Court has interpreted the two different clauses in this same statutory provision to require *different* approaches—one categorical, and one circumstance-specific.

In *Nijhawan*, the Court had considered the second part of that definition—the "loss" clause. The Court concluded that the "loss" clause required circumstance-specific analysis, and thus did not require application of the categorical approach. 557 U.S. at 32. The Court reasoned that the definition of "aggravated felony" in the INA contained two types of definitions for the term: (1) generic crime definitions; and (2) specific circumstances definitions. *Id.* at 37–38. In concluding that the "loss" phrase was a specific circumstances definition, the Court held that the "loss" phrase "refer[s] to the conduct involved '*in*' the commission of the offense of conviction, rather than to the elements *of* the offense." *Id.* at 39.

Later, in *Kawashima*, the Court considered the first part of the definition—the "fraud or deceit" clause. When considering that part of the definition, the Court "employ[ed] a categorical approach by looking to the statute defining the crime of conviction, rather than to the specific facts underlying the crime." 565 U.S. at 483. Thus, even where the Court had already considered part of the statutory provision to be circumstance-specific, the Court still in a later case applied the categorical approach to another part of the same provision based on the textual differences between the two

76

clauses. The aggravators in (c)(2) and (c)(4) much more closely resemble the "fraud or deceit" clause to which the categorical approach is applied, and not the "loss" clause under which there is a circumstance-specific analysis. To the extent the government and the majority argue that because the categorical approach does not apply to some aggravators means it cannot apply to any aggravators, this pair of cases soundly rejects such a position.

Additionally, the majority focuses on the specifics of the sentencing hearing in order to conclude that the text of the FDPA does not support applying the categorical approach. *Ante* at 46–47. The majority concludes that because aggravating and mitigating evidence may be presented during the sentencing hearing, this indicates that the categorical approach cannot be applied. *Id.* This emphasis is misplaced not only for the reasons explained above regarding eligibility versus selection, but also because it ignores what actually happens in an ACCA case.

In an ACCA case, once the court applies the categorical approach to determine whether the mandatory minimum sentencing enhancement applies, that does not conclude the sentencing process. The court must still go through the Guidelines, determine whether there should be changes to the offense level, and determine an appropriate sentence guided by the sentencing factors in 18 U.S.C. § 3553(a). Nothing prohibits a sentencing court from considering the specifics of previous offenses in determining, for example, whether a lengthier sentence is needed to ensure deterrence. Indeed, 18 U.S.C. § 3553(a) specifically instructs the sentencing court to consider "the nature and circumstances of the offense and *the history and characteristics of the defendant*." 18

77

U.S.C. § 3553(a)(1) (emphasis added). I can see no meaningful distinction between those instructions to a sentencing court in a non-capital case, and the instruction that at a sentencing hearing for a capital defendant "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor." 18 U.S.C. § 3593(c) (cited by the majority, *ante* at 46). And yet, the majority concludes that the former permits the categorical approach, while the latter prohibits it.

Finally, in rejecting the textual argument, the majority fears that employing the categorical approach would be unwieldy, because the meaning of the (c)(2) and (c)(4) aggravators "would carry different meanings throughout the penalty phase." *Ante* at 48. This is an overstated fear, and internally inconsistent with our approach to the FDPA sentencing process. Other statutory language from FDPA has different meanings in the eligibility and selection phases, and this has not proved problematic. For instance, the plain text of the FDPA requires only that the jury "identify[] any aggravator factor or factors set forth in section 3592 found to exist" to sentence a defendant to death *Id.* § 3593(d). However, this scheme has been interpreted to require that for the purposes of eligibility, that provision from § 3593(d) must mean a specifically enumerated factor under § 3592, but for the purposes of selection, it means the additional non-statutory aggravators. *See Jones*, 527 U.S. at 377–78 & n.2. This language "carry[ing] different meanings throughout the penalty phase," *ante* at 48, has not proved problematic, and thus this concern should not drive our reasoning here.

In sum, I find the text supports and mandates that we apply the categorical approach to the (c)(2) and (c)(4) aggravators.

78

b.

Turning next to concerns between judge and jury, I recognize that the same Sixth Amendment concerns that exist in the ACCA context are not present in the FDPA context, as the statute requires the sentencing decisions to be rendered either by the jury or the court upon the defendant's motion and the government's approval. *See* 18 U.S.C. § 3593(b). However, the role of the jury is still a relevant factor to be considered. The majority concludes that applying the categorical approach would "completely usurp[]" the jury's statutory role in capital sentencing. *Ante* at 49. This is incorrect.

Applying the categorical approach would be entirely consistent with the role of the jury in the FDPA. The judge would first determine whether the prior convictions categorically qualify under (c)(2) and (c)(4). Then, the jury would determine at eligibility whether the government has sufficiently proved that the prior convictions exist.[6] Assuming the case moves on to selection, the jury would then hear all relevant

---

[6] To the extent this is open to criticism that this would be a perfunctory role for the jury to perform, I note that we require it of the jury in the context of an 18 U.S.C. § 922(g)(1) felon in possession case. The jury must find that the defendant was actually a felon prohibited from possessing a firearm as an element of the offense. *See United States v. Langley*, 62 F.3d 602, 604 (4th Cir. 1995) (en banc) (laying out the elements of the § 922(g)(1) offense, the first of which is the defendant "had been convicted in some court of a crime punishable by a term of imprisonment exceeding one year"). Although often stipulated to by the defendant for strategic reasons, the jury still must find that element. *See United States v. Muse*, 83 F.3d 672, 679 (4th Cir. 1996) ("[O]nce a defendant pleads not guilty to a crime and elects to proceed before a jury, the district court must instruct, and the jury must consider, whether the government has proved beyond a reasonable doubt all the elements involved in the crime charged—even if the defendant and the government have entered a stipulation as to certain of those elements.").

evidence about prior convictions for its selection decision, and appropriately return findings about aggravating factors, mitigating factors, and a sentence recommendation. This envisioned scheme does not detract from the jury's prescribed function of "consider[ing] each . . . aggravating factor[] for which notice has been given and determin[ing] which, if any, exist."  18 U.S.C. § 3592(c).

Further, in expressing its concerns regarding the role of the jury, the majority ignores the way in which we already use this scheme under the ACCA for offenses committed under 18 U.S.C. § 924(c)(1)(A), which proscribes using or carrying a firearm during and in relation to a crime of violence as defined by 18 U.S.C. § 16.  In those crimes, the court first determines—under the categorical approach—whether the alleged underlying offense qualifies as a crime of violence.  The jury then determines—using all available facts—(1) whether a crime of violence was committed; and if so, (2) whether a firearm was used during that crime.  *See United States v. Hopkins*, 310 F.3d 145, 152–53 (4th Cir. 2002).  Thus, the role of the jury under my interpretation for the eligibility stage of the (c)(2) and (c)(4) aggravators is similar to how we consistently use the jury in the determination of guilt or innocence under the ACCA.

Therefore, while recognizing a lessened Sixth Amendment concern on this issue, I conclude that the jury would retain a meaningful role in the assessment of eligibility factors under the categorical approach.

c.

Finally, the issue of perceived unfairness weighs in favor of applying the categorical approach. The majority concludes that because the FDPA does not require bifurcated sentencing proceedings, there can be no perceived unfairness to the defendant. *Ante* at 50. The majority further concludes that the categorical approach would fail to genuinely narrow the class of death eligible defendants. *Ante* at 51. I disagree on both points.[7]

In responding to both conclusions from the majority I am again guided by the significant difference that must exist in the eligibility and selection phase of sentencing. Even if conducted in one unified hearing, there are still different standards guiding the jury regarding what evidence may be considered at each phase, a point I make in great detail in Sections II.B.2 and II.B.3.a, *supra*, and need not repeat here.

The second conclusion additionally twists death penalty jurisprudence completely. It is quite bizarre to find that applying the categorical approach to these aggravators somehow runs afoul of the Eight Amendment requirement that statutory aggravators "genuinely narrow the class of persons eligible for the death penalty." *Zant*, 462 U.S. at 877. Applying the categorical approach will necessarily decrease the number of death eligible defendants under these aggravators, not increase the number. This concern is

_____

[7] Having found that *Higgs*'s holding was implicitly overruled, I do not reach the issue of drawing a distinction between the unitary sentencing proceeding that occurred in *Higgs* and the bifurcated sentencing proceeding that occurred below. Thus, I do not respond to the majority's arguments on this point.

81

especially strange in light of our shared conclusion that permitting post-offense convictions to qualify as previous convictions "expands the class of offenders with previous convictions . . . [and] nonetheless narrows the class of all murderers to only murderers with previous convictions." *Ante* at 36. Applying the categorical approach further does not narrow the class of defendant in an arbitrary manner such that this interpretation would otherwise run afoul of the Eighth Amendment. *Cf. Godfrey v. Georgia*, 446 U.S. 420, 427 (1980) ("[T]he penalty of death may not be imposed under sentencing procedures that create a substantial risk of that the punishment will be inflicted in an arbitrary and capricious manner.").

Moreover, the majority also argues that the categorical approach would prevent a jury from giving a sentence of death to "the most culpable defendants committing the most serious offenses," *Miller v. Alabama*, 132 S. Ct. 2455, 2467 (2012). Notably, this fear that defendants would be excluded is at odds with the majority's concern that the class of eligible persons is not genuinely narrowed. And nothing about this approach would violate the requirement that the class of death-eligible defendants be narrowed in a genuine manner, as the categorical approach is, in fact, "objective, evenhanded, and substantively rational." *See Caro*, 597 F.3d at 623 (quoting *Zant*, 462 U.S. at 879) (cited by majority, *ante* at 51).

Additionally, this concern is completely unfounded. Congress has made clear who the "most culpable" defendants are—those who satisfy the statutory aggravators. It is not for us to make a moral judgment about who should and should not be considered the "most culpable;" it is for us to interpret the statutory aggravator as written by Congress

and determine whether a defendant actually falls within that aggravator. Further, so long as the defendant's prior convictions qualify, *nothing* about applying the categorical approach at the eligibility phase would prevent information about the specifics of the prior convictions from being introduced at the selection phase. Additionally, if there are other aggravators that make the defendant death eligible, the categorical approach to the prior convictions statutory aggravator does not matter for the purposes of eligibility, and the information could be presented to the jury as a non-statutory aggravator during selection.

The real issue in determining unfairness to the defendant is the inequity that would occur if non-elemental facts were used to render the defendant death eligible. Using such facts is inherently unfair, for "[s]tatements of 'non-elemental fact' in the records of prior convictions are prone to error precisely because their proof is unnecessary." *Mathis*, 136 S. Ct. at 2253. The reasoning for why this would be unfair to defendants in the ACCA context rings true in the FDPA context:

> At trial, and still more at plea hearings, a defendant may have no incentive to contest what does not matter under the law; to the contrary, he "may have good reason not to"—or even be precluded from doing so by the court. When that is true, a prosecutor's or judge's mistake as to means, reflected in the record, is likely to go uncorrected. Such inaccuracies should not come back to haunt the defendant many years down the road by triggering a lengthy mandatory sentence.

*Id.* (citations and footnote omitted). But in the FDPA context, this does not trigger a lengthy mandatory sentence; instead, it triggers a defendant's actual life and right to continued existence being put in jeopardy. There can be no greater unfairness.

Therefore, I find that perceived unfairness to the defendant also weighs in favor of applying the categorical approach.

## C.

Finally, I would assess the convictions used by the government to determine whether they satisfy the (c)(2) and (c)(4) aggravators. In order for Torrez's death sentence to be vacated, the convictions must fail to satisfy both of the aggravators. I would conclude that they do.

## 1.

Torrez's prior convictions under Virginia law cannot make him death eligible under (c)(2). To qualify as a prior conviction under (c)(2), the prior conviction must involve "a firearm (as defined in section 921 [of Title 18])." 18 U.S.C. § 3592(c)(2). Instructive on this issue is *Mellouli v. Lynch*, 135 S. Ct. 1980 (2015), an immigration case applying the categorical offense to a prior state drug conviction. There, the alien had pleaded guilty to a misdemeanor drug offense in Kansas; however, neither the criminal charge nor the plea agreement identified which drugs qualified as controlled substances, and the statute broadly covered multiple controlled substances. *Id.* at 1983. Immigration officials then sought to remove the alien under a provision of the INA that "authorizes the removal of an alien 'convicted of a violation of . . . any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21).'" *Id.* at 1984 (quoting 8 U.S.C. § 1227(a)(2)(B)(i)) (omission in original). The Kansas state crime did not define a controlled substance with respect to

84

the federal definition contained in 21 U.S.C. § 802; indeed, "it was immaterial under that [state] law whether the substance was *defined in 21 U.S.C. § 802*," and the state prosecutors did not "charge, [n]or seek to prove, that [the alien] possessed a substance on the § 802 schedules." *Id.* Accordingly, the Court found that federal immigration law did not authorize removal, because under the categorical approach, the government could not "connect an element of the alien's conviction to a drug 'defined in [§ 802].'" *Id.* at 1991 (addition in original).

Torrez's conviction and the (c)(2) aggravator present the same problem. The (c)(2) aggravator specifically links the definition of a firearm to 18 U.S.C. § 921. Therefore, we must look to the definitions in 18 U.S.C. § 921 of a firearm, and compare that definition with the conduct criminalized by the Virginia statutes. Section 921 exempts antique firearms from the definition of "firearm," *id.* § 921(a)(3); exempts certain shotguns, *id.* § 921(a)(4)(B); and requires that the weapon actually be capable of expelling a projectile or being readily converted to do so, *id.* § 921(a)(3)(A). Section 921 also expressly includes "any destructive device" within the definition of "firearm." *Id.* § 921(a)(3)(D).

The statute under which Torrez has four convictions, Va. Code § 18.2-53.1, prohibits the use, attempted use, or display of "any pistol, shotgun, rifle, or other firearm" in connection with certain felonies. As the Supreme Court of Virginia has held, this statute criminalizes not only "the use or display of an actual firearm that has the capability of expelling a projectile by explosion," but also "an instrumentality that has the *appearance* of having the capability of an actual firearm." *Startin v. Commonwealth*, 706

85

S.E.2d 873, 877 (Va. 2011) (citing *Holloman v. Commonwealth*, 269 S.E.2d 356, 358 (Va. 1980)). Thus, Virginia gives "a *broad* construction" to the term "firearm" in Va. Code. § 18.2-53.1. *Id.* at 878 (internal quotation marks omitted).

Torrez also has one conviction for common law burglary under Va. Code § 18.2-89, which has a grading enhancement if the defendant "was armed with a deadly weapon at the time." Although no case from the Supreme Court of Virginia has defined "deadly weapon" for the purposes of this burglary statute, there have been lower court opinions defining the term "deadly weapon" for the purposes of another statute which criminalized bank burglary. *See Justiss v. Commonwealth*, 734 S.E.2d 699, 707 (Va. App. 2012) ("A deadly weapon is any object or instrument, not part of the human body, that is likely to cause death or great bodily injury because of the manner and under the circumstances in which it was used." (internal quotation marks and alterations omitted) (citing *Cox v. Commonwealth*, 240 S.E.2d 524, 526 (Va. 1978)); *see also* Va. Prac. Jury Instructions § 80:23 (same). Thus, a knife could be used as "a deadly weapon" to satisfy the grading enhancement in Virginia.

Because Virginia criminalizes even the use of toy guns that look like real ones under Va. Code § 18.2-53.1 and the use of any deadly weapon during a burglary under Va. Code § 18.2-89, neither crime requires the use of "a firearm (as defined in section 921)." Additionally, the record discloses no evidence that the Virginia prosecutors sought to prove that the weapons used by Torrez in the commission of those offenses satisfied the federal definition of "a firearm (as defined in section 921)."

Accordingly, Torrez has no convictions that satisfy the (c)(2) aggravator.

86

2.

In order for the (c)(4) aggravator to be met, the prior offenses must (1) be committed on at least two separate occasions, and (2) "involv[e] the infliction of, or attempted infliction of, serious bodily injury or death upon another person." 18 U.S.C. § 3592(c)(4). The two relevant dates here are February 10, 2010, and February 27, 2010—the two dates on which the Arlington Offenses were committed. Torrez does not challenge whether the February 27, 2010 offenses satisfy (c)(4), but he does challenge the February 10, 2010, offenses.[8] If the February 10, 2010, offenses do not categorically "involv[e] the infliction of, or attempted infliction of, serious bodily injury or death upon another person," then the (c)(4) aggravator cannot be met.

Torrez was convicted of committing robbery in violation of Va. Code § 18.2-58 and abduction with nefarious intent in violation of Va. Code § 18.2-48 on February 10, 2010, in connection with his attack on M.N. I would find that neither offense can satisfy (c)(4).

The requirement in (c)(4) of "seriously bodily injury or death" is similar to what we know as the "force clause" contained in the definition of "violent felony" under the ACCA and the definition of "crime of violence" under the career offender sentencing

---

[8] Torrez does not concede that the February 27, 2010 offenses qualify, *see* Appellant's Br. at 73, but as the government rightly responds, failure to present an argument as to those offenses in the opening brief constitutes waiver, *see* Appellee's Br. at 84–85.

guideline,[9] as well as in other areas of Title 18 and the sentencing guidelines. Therefore, cases interpreting that clause throughout the relevant legal landscape are relevant here. Importantly, the (c)(4) requirement is *higher* than the force clause in the ACCA and the Guidelines. Whereas the ACCA and the Guidelines require only "physical force" and permit such force to be "threatened," *see* 18 U.S.C. § 924(e)(2)(B)(i); U.S.S.G. § 4B1.2(a)(1), the (c)(4) aggravator requires actual or attempted infliction of "serious bodily injury or death," 18 U. S.C. § 3592(c)(4). Thus, if a crime categorically fails under either the force clause of the ACCA or the Guidelines, it must *a fortiori* fail the (c)(4) requirement.

a.

First, we look at Torrez's conviction for common law robbery. Recently, in *United States v. Winston*, 850 F.3d 677 (4th Cir. 2017), we considered whether common law robbery in violation of Va. Code § 18.2-58 was a violent felony under the ACCA. We held that "the minimum conduct necessary to sustain a conviction for Virginia common law robbery does not necessarily include the use, attempted use, or threatened use of 'violent force . . . capable of causing physical pain or injury to another person.'" 850 F.3d at 685 (quoting *Johnson v. United States*, 559 U.S. 133, 140 (2010)) (omission

---

[9] *See* 18 U.S.C. § 924(e)(2)(B)(i) ("[T]he term 'violent felony' means any crime . . . that has as an element the *use, attempted use, or threatened use of physical force* against the person of another . . . .") (emphasis added); U.S.S.G. § 4B1.2(a)(1) ("The term 'crime of violence' means any offense . . . that has as an element the *use, attempted use, or threatened use of physical force* against the person of another . . . .") (emphasis added).

in original).  Accordingly, we found that robbery in violation of Va. Code § 18.2-58 could not satisfy the force clause of the ACCA and could not be a prior conviction for the purposes of the ACCA sentencing enhancement.  As such, Torrez's robbery conviction also cannot qualify under the (c)(4) aggravator.

b.

Because Torrez's robbery conviction fails to satisfy the (c)(4) aggravator, the abduction offense must do so in order for the death sentence to be upheld.  It does not. Torrez was conviction of abduction with nefarious intent in violation of Va. Code § 18.2-48.  This offense raises the issue of divisibility under the categorical approach, because it lays out five different options for violating the statute.

If a statute "set[s] out elements in the alternative and thus create[s] multiple versions of the crime," we consider the statute divisible and apply what we call the modified categorical approach.  *United States v. Montes-Flores*, 736 F.3d 357, 365 (4th Cir. 2013) (internal quotation marks omitted).  "[A] crime is divisible [for the purposes of the categorical approach] only if it is defined to include multiple alternative *elements* (thus creating multiple versions of a crime), as opposed to multiple alternative *means* (of committing the same crime)."  *Omargharib v. Holder*, 775 F.3d 192, 198 (4th Cir. 2014) (citations omitted).  In the instance of a divisible crime, we "look[] to a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of." *Mathis*, 136 S. Ct. at 2249.

I need not decide whether the offense set out in Va. Code § 18.2-48 is divisible; I can assume it is for the purposes of this analysis. Assuming divisibility and looking to the jury's actual verdict form, Torrez was convicted of "abduction . . . with the intent to defile and/or the intent to extort money or gain pecuniary benefit" in violation of Va. Code § 18.2-48. J.N. 257. Thus, it is entirely unclear from the verdict form if the intent agreed upon by the jury was "intent to defile" or "intent to extort money or gain pecuniary benefit" with respect to his abduction of M.N. Assuming the least culpable criminal conduct under the categorical approach, the jury could have found Torrez guilty of abduction with intent to extort money. Extortion requires *no* force, let alone the actual or threatened infliction of serious bodily injury or death. As a result, the abduction offense does not qualify under the (c)(4) aggravator. Therefore, no February 10, 2010, offense qualifies, and thus (c)(4) cannot be satisfied because the only qualifying crimes were all committed on February 27, 2010.

III.

Because I find that our holding in *Higgs* with respect to the categorical approach has been implicitly overruled by the Supreme Court, I would consider the issue anew and find that the categorical approach should apply to the aggravators found at 18 U.S.C. § 3592(c)(2) & (c)(4). Then, applying the categorical approach, I would find that the prior convictions asserted by the government do not satisfy either of those statutory aggravators. Accordingly, I would vacate the sentence of death in this case, strike the

90

(c)(2) and (c)(4) aggravators from the government's notice of intent to seek the death penalty, and remand for resentencing.

The death penalty is a complicated area of our law, especially when dealing with what makes a defendant eligible for capital punishment. I do not question the wisdom of Congress in passing the FDPA, nor do I question the wisdom of this nation's vaunted prosecutors from using all available tools in their zealous prosecution of crime. But capital punishment must be effected fairly, consistently, without prejudice, and with the opportunity for mercy. Although the categorical approach may render certain defendants who would otherwise be death eligible no longer able to be considered for capital punishment, applying this understanding hews to the language of the statute as drafted by Congress.

For these reasons, I respectfully dissent from the majority's holding with respect to Torrez's sentence.